# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Diamond M.*, 2011 IL App (1st) 111184

---

| | |
|---|---|
| Appellate Court Caption | *In re* DIAMOND M., a Minor (People of the State of Illinois, Petitioner-Appellee, v. Marie M., Respondent-Appellant). |
| District & No. | First District, Second Division<br>Docket No. 1-11-1184 |
| Filed | August 30, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's finding that respondent's adopted child was a neglected minor was not against the manifest weight of the evidence and respondent's contention that the child should have been adjudged dependent was rejected where there was evidence that respondent failed to provide a place for the child to live and showed a lack of concern for getting necessary psychological care. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-JA-0686; the Hon. Joan Kubalanza, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Abishi C. Cunningham, Jr., Public Defender, of Chicago (Evelyn G. Baniewicz, Assistant Public Defender, of counsel), for appellant. |
|---|---|
| | Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain, Mary Brigid Hayes, and Susan S. Wigoda, of counsel), guardian *ad litem*. |
| Panel | JUSTICE CONNORS delivered the judgment of the court, with opinion. Presiding Justice Cunningham and Justice Karnezis concurred in the judgment and opinion. |

**OPINION**

¶ 1 Following an adjudication hearing, the trial court found that Diamond M. was a neglected minor due to lack of care and an injurious environment and, after a dispositional hearing, made Diamond a ward of the court. Respondent Marie M. appeals the trial court's finding that Diamond was neglected. We affirm.

¶ 2 BACKGROUND

¶ 3 At the adjudication hearing, the State presented the testimony of Shirley Barsh, the Illinois Department of Children and Family Services (DCFS) investigator assigned to Diamond's case, and introduced into evidence approximately 2,000 pages of Diamond's medical records. Because of the sheer volume of the evidence, we will summarize here only the pertinent facts that were argued by the parties before the trial court.

¶ 4 By all accounts, Diamond was extremely troubled psychologically and emotionally. She was treated over several years at various facilities including St. Mary of Nazareth Hospital, Hartgrove Hospital, and Grand Prairie Services. Respondent adopted Diamond in 2000, when Diamond was about three years old. Diamond had been fostered by respondent before the adoption, and respondent had at least two other adopted children and several other foster children in the home over the years. Significant troubles began in early August 2006, when Diamond was first brought to Grand Prairie. Notes from that visit indicated that Diamond was abnormally aggressive and destructive, noting that she had attempted to destroy respondent's "breathing machine"[1] and had destroyed other property at home and at school. Diamond apparently indicated at that time that she "wished she were dead." Her risk to herself and others was rated as "moderate" on the staff evaluation.

¶ 5 Later that month, Diamond was admitted to St. Mary's for inpatient psychiatric care,

---

[1]The nature of the breathing machine and why respondent owned one is never made clear in the record, but references are made in passing to respondent's unspecified medical conditions.

where she remained for treatment for about a week. Notes from that stay indicate that respondent brought Diamond in for treatment because Diamond had been collecting "sharp things" and had been talking to herself. Respondent reported that Diamond had been unusually aggressive and impulsive for years, and respondent related incidents in which Diamond had allegedly attempted to force a doll down another child's throat, had hidden scissors and screwdrivers, and had "mess[ed]" with respondent's insulin. In other notes, Diamond acknowledged that she had an anger management problem, and also indicated that respondent's primary method of discipline was to yell and grab Diamond's face. Diamond was discharged in early September and was prescribed Risperdal, which can be used to treat schizophrenia and bipolar disorder in adolescents. Diamond also received a treatment plan through Grand Prairie.

¶ 6    Through Grand Prairie, a therapist visited Diamond and respondent at their home. Notes from the Grand Prairie treatment attribute a large part of Diamond's problems to respondent's own inconsistency and lack of follow through. Notably, one treatment note stated that, during sessions at home, respondent would begin listing problems that she had with Diamond as if Diamond were not present, and at other times would focus her attention on the television set rather than the therapy. Another treatment note from 2007 indicated that Diamond "appears to test the limits in part due to [respondent's] consistent threats of 'returning [Diamond] back to DCFS.' "

¶ 7    Late in 2007, Diamond was admitted to Hartgrove after respondent discovered a suicide note that Diamond had written. Respondent also reported that Diamond had been cutting herself. Later treatment notes indicated that Diamond had been talking to her socks about suicide and had been eating inappropriate things such as crayons. Diamond was discharged from inpatient care in January 2008, and she was given a prescription for antidepressants.

¶ 8    At some point later, however, Grand Prairie notes indicated that respondent was dissatisfied with the diagnosis of depression and revoked her consent for Diamond's antidepressant prescription. In March 2008, Diamond was again evaluated after she allegedly threatened a teacher and refused to attend school. Outpatient therapy was recommended, and respondent agreed to make therapy appointments. This therapy appeared to help, but in fall 2008 respondent cancelled four sessions. Respondent later refused to continue treatment for Diamond because she did not think that treatment was helping. During this same year, treatment notes indicated that Diamond was acting out sexually, stealing, and engaging in disruptive behavior at home and at school. Other treatment notes near the end of the year indicated that respondent's own behavior was a large part of the problem. According to the notes, respondent overreacted to Diamond's behavior, which would then lead to further problems.

¶ 9    During summer 2009, Diamond participated in a children's community support group, and in November she attended an orientation at Mercy Home, an alternative living facility for troubled adolescents. A note in the record from that time indicated that Diamond was probably a suitable candidate for treatment at Mercy Home, but further stated that "[respondent] was not willing to lose her adoption payments for [Diamond] to temporarily live in Mercy Home." Although the note indicated that Mercy was to follow up with respondent on placing Diamond in the home, there is no indication in the record that this

option was explored further.

¶ 10    Matters finally came to a head in May 2010 when an outpatient psychiatric report found that Diamond had been physically aggressive with others at school, had been cutting herself, and had been eating garbage, kitchen cleanser, and dog food. The report recommended hospitalization because of Diamond's depression and risk of harm to herself. The report also noted that respondent had declined follow-up psychiatric services. After her admission, Diamond reported that she was neither suicidal nor homicidal, but did indicate that she wanted to hurt respondent. Respondent indicated that Diamond had unplugged respondent's supplemental oxygen machine and had cut the family dog's tail. During later evaluations, Diamond reported that respondent physically abused her by hitting her with belts, sticks, shoes, and her hands. Diamond also reported that respondent had once starved her for several days, and that respondent's former husband had physically and sexually abused her.

¶ 11    Respondent initially attended Diamond's treatment sessions at Hartgrove, but in mid-May she failed to attend a scheduled session. From this point on, notations appear that indicate that respondent was unwilling to take Diamond back into her home following her discharge from Hartgrove. Respondent indicated that she did not feel safe around Diamond. Other notes from this period chronicle Diamond's increasing feelings of isolation from her family, and that Diamond felt that respondent's parenting was Diamond's primary source of stress. A note from May 30, 2010 recounts that Diamond was agitated and visibly upset because respondent refused to speak with her, and Diamond indicated that she did not want to return to live with respondent.

¶ 12    On June 3, 2010, Hartgrove staff determined that Diamond was ready for discharge, but she could not be discharged because respondent was unwilling to let her return home. At this point, Shirley Barsh was dispatched by DCFS in order to investigate the situation. As she recounted at trial, Barsh met with respondent on June 3 at her home, at which time she stated that she refused to pick up Diamond because Diamond had threatened to kill her and that Diamond did not want to come home. Although respondent stated that Diamond had mental health issues, respondent did not offer any alternative plans for Diamond's treatment or present any alternative places in which Diamond could live.

¶ 13    On June 29, 2010, Barsh spoke with Diamond at Hartgrove. Diamond indicated that she did not want to go home with respondent, and she admitted that she sometimes harmed respondent when she became upset. On July 27, 2010, DCFS convened a clinical staffing meeting for Diamond. At this meeting, which respondent attended, DCFS recommended residential treatment for Diamond. Respondent did not offer any facilities in which to place Diamond. Barsh spoke with respondent again the next day, and respondent again did not offer any suggestions for residential treatment.

¶ 14    On August 5, 2010, the State filed a petition for adjudication of wardship in the circuit court, alleging that Diamond was a neglected minor. As the State alleged in its petition, Diamond had been psychiatrically hospitalized since May 2010, but was now ready for discharge and respondent refused to allow her to return home or to arrange alternative care for her. The trial court granted temporary custody to the Department of Children and Family Services (DCFS).

¶ 15    Following presentation of evidence at the adjudicatory hearing, the State and the guardian *ad litem* argued that Diamond was neglected due to lack of care and due to an injurious environment. See 705 ILCS 405/2-3(1)(a) (West 2010). In contrast, respondent urged the trial court to enter a finding of no-fault dependency. See 705 ILCS 405/2-4(1)(c) (West 2010). In an extensive ruling read into the record, the trial court found that Diamond was neglected, primarily based on respondent's refusal to allow Diamond to return home from Hartgrove and her failure to arrange for suitable alternative care.

¶ 16    The trial court went on to hold a dispositional hearing, at which the court found that respondent was both unable and unwilling to care for Diamond, and made Diamond a ward of the court. Respondent timely appealed, and this case is now before us.

¶ 17                                    ANALYSIS

¶ 18    We initially observe that respondent has only challenged the trial court's adjudication order finding that Diamond was a neglected minor, and she does not challenge the trial court's dispositional order finding her unable and unwilling to care for Diamond. We therefore limit our review to the adjudication order. See Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008).

¶ 19    The primary issue in the case is whether Diamond should be adjudicated a "neglected" minor or merely "dependant." As relevant to this case, section 2-3(1)(a) of the Juvenile Court Act of 1987 defines a neglected minor to include one

> "who is not receiving the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for a minor's well-being, or other care necessary for his or her well-being, including adequate food, clothing and shelter." 705 ILCS 405/2-3(1)(a) (West 2010).

Additionally, minors are neglected under section 2-3(1)(b) if their "environment is injurious to [their] welfare." 705 ILCS 405/2-3(1)(b) (West 2010). In contrast, a dependant minor under section 2-4(1)(c) is one "who is without proper medical or other remedial care recognized under State law or other care necessary for his or her well being through no fault, neglect or lack of concern by his parents, guardian or custodian." 705 ILCS 405/2-4(1)(c) (West 2010).

¶ 20    On review, we will not reverse the circuit court's determinations unless they are against the manifest weight of the evidence. See *In re Christopher S.*, 364 Ill. App. 3d 76, 86 (2006). "A circuit court's finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident from the record." *Id.*

¶ 21    In this case, the circuit court determined that Diamond was neglected, not dependant. "Neglect" is generally defined as

> "failure to exercise the care that circumstances justly demand and includes both willful and unintentional disregard of parental duties. [Citation.] The term is not a 'fixed and measured meaning' and it takes its content from specific circumstances of each case. [Citation.] Accordingly, cases involving an adjudication of neglect and wardship are *sui generis*, and each case must be decided on the basis of its own

unique circumstances. [Citation.]" *Id.* at 88.

¶ 22      Importantly, the focus of our inquiry is on the status of the child, not the conduct of the parent. *In re Arthur H.*, 212 Ill. 2d 441, 467 (2004). In this case, the State alleged in its petition that Diamond was neglected in two ways, that is, that she (1) lacked necessary care and (2) was subject to an injurious environment. The circuit court ruled that Diamond was neglected in both ways. In so finding, the circuit court noted that respondent had (1) failed to provide Diamond with shelter when she refused to allow Diamond to return home from Hartgrove when Diamond was ready for discharge and refused to find an alternative place for her to stay; (2) failed to visit Diamond for over two months while she was hospitalized and failed to appear for scheduled visits; (3) failed to make herself available for consultation to Diamond's care providers; and (4) failed to make any sort of care plan for Diamond following her discharge.

¶ 23      Respondent argues that the circuit court failed to give adequate weight to the ample evidence in the record demonstrating that Diamond was physically aggressive, that respondent feared for her safety when Diamond was present, that Diamond did not want to return home, and that Diamond had significant mental health issues. In essence, respondent argues that she did everything she could in order to help Diamond that a parent could reasonably be expected to do and that therefore a finding of no-fault dependency is more appropriate than a finding of neglect.

¶ 24      Respondent cites in support two cases that are factually very similar to the instant case, both of which were considered by the circuit court. First, respondent directs our attention to *In re Christopher S.*, 364 Ill. App. 3d 76 (2006). In *Christopher S.*, the State filed a petition for adjudication of wardship when it became aware that the minor had been "locked out," that is, his adoptive parents had refused to pick him up at a psychiatric hospital following his discharge and refused to allow him back into their home. *Id.* at 79. The respondents informed a DCFS investigator that the minor was out of control and had "threatened violence against the family." *Id.* Upon being informed that his parents did not want him to come home, the minor stated that he did not want to live with them. *Id.* The respondents attempted to arrange for the minor to live at Mercy Home (the same home at issue in this case), and stated that they were willing to pay to lodge the minor at Mercy, but Mercy denied admission to the minor. *Id.* The respondents eventually found a biological aunt who agreed to take the minor in. *Id.*

¶ 25      At the adjudicatory hearing, there was extensive testimony about the minor's long-standing behavioral problems, aggression, violence, and possible larceny and other criminal acts. *Id.* at 79-81. The respondents attempted a number of alternative housing arrangements and therapies for the minor, including military school and psychiatric hospitalization, but nothing was successful. After the lockout, the respondents continued to be actively involved in locating treatment for the minor, including attempted placements in 43 separate residential placement homes in a single month. *Id.* at 83. Due to the minor's behavioral and criminal problems, no treatment center would admit him, and because he was not a ward of the state, he was not eligible for some treatment options. *Id.*

¶ 26      Although the guardian *ad litem* argued for a finding of neglect due to lack of necessary

care, the circuit court found that the minor was dependant through no fault of the respondents. *Id.* at 84. On appeal by the guardian, this court affirmed the finding of dependency. See *id.* at 88-89. We noted that

> "the evidence is clear that respondents did not neglect [the minor]. The guardian *ad litem* would have this court find that respondents neglected [the minor] because they could not accomplish an impossible task, which was to force [the minor] to partake in the process of returning home against his will. The guardian *ad litem*'s argument defies logic, common sense, and most importantly the law. The cases upon which the guardian *ad litem* relies are distinguishable as respondents in this case only refused to take [the minor] home after a violent incident ensued, causing respondent mother to fear for her safety and that of her family. Caring for respondents' family's safety, which also included [the minor]'s own safety, showed great parental concern for [the minor]'s well-being, not neglect. Furthermore, respondents made every effort to arrange an alternative care they could afford." *Id.*

¶ 27    As respondent points out, there are a number of factual similarities between the instant case and *Christopher S.*, in particular the fact that in both cases there was a lockout and there was evidence that the minors were physically aggressive and that the respondents feared for their safety. There are, however, two critical differences between these two cases that respondent fails to recognize. First, the record demonstrates that respondent made no effort to find alternative living arrangements for Diamond. Indeed, respondent rejected applying to Mercy Home for Diamond out of hand because she did not want to use her adoption subsidies to pay for Diamond's treatment there. This is starkly unlike *Christopher S.*, in which the minor's parents offered to pay for the minor's residence at Mercy. It is true that there was a question in this case as to whether Diamond was acceptable to Mercy, but the minor in *Christopher S.* was rejected by Mercy yet his parents did not give up. Instead, they attempted to place him in at least 43 other residential treatment facilities. There is no evidence in the record that respondent made any remotely comparable efforts to find a residence for Diamond, and there is no evidence that suggests respondent was financially unable to provide alternative care for Diamond.

¶ 28    Second, as the trial court noted in its ruling, there was ample evidence in the record, particularly from Diamond's time at Hartgrove, that respondent was not cooperative with Diamond's care providers. Unlike the parents in *Christopher S.*, who were at all times actively involved in the minor's care and treatment, the record contains numerous instances in which respondent failed to attend scheduled visits and treatment sessions or was unable to be contacted. The trial court made special mention of the fact that respondent failed to visit or contact Diamond for over two months while she was hospitalized at Hartgrove. Unlike *Christopher S.*, respondent's actions in this case demonstrate a complete lack of concern for Diamond's well-being and are not consistent with no-fault dependency. See 705 ILCS 405/2-4(1)(c) (West 2010) (dependency must be due to "no fault, neglect or lack of concern by his parents, guardian or custodian").

¶ 29    The second case that respondent relies on is *In re S.W.*, 342 Ill. App. 3d 445 (2003). That case also involved a lockout following a hospitalization, and the evidence presented at the adjudicatory hearing demonstrated that the minor had an extensive history of psychological

problems, physical aggression and violence, and was "out of control." *Id.* at 447-50. The circuit court entered a finding of no-fault dependency, which we upheld on appeal. See *id.* at 450, 452.

¶ 30 S.W. is distinguishable for many of the same reasons as *Christopher S.* Unlike *S.W.*, in which there was no evidence that the minor's mother failed to arrange alternative care or treatment for the minor following the lockout, there is ample evidence in this case that respondent did not make sufficient efforts to find Diamond necessary care and shelter. Moreover, unlike this case there was almost no evidence that the mother in *S.W.* demonstrated a lack of concern for the minor's wellbeing.

¶ 31 In sum, there are significant factual distinctions between this case and the cases that respondent relies on in support of the proposition that a finding of neglect was error. Aside from the factual distinctions, however, there is an important procedural difference that should be highlighted. In both *Christopher S.* and *S.W.*, the circuit court entered findings of dependency, which were affirmed on appeal. In contrast, in this case the circuit court entered a finding of neglect. As we stated above, we review the circuit court's finding at an adjudicatory hearing only to determine whether it is against the manifest weight of the evidence. See *In re Christopher S.*, 364 Ill. App. 3d at 86. This is a relatively deferential standard of review that "is grounded in the reality that the circuit court is in a superior position to observe the demeanor of the witnesses, determine and weigh their credibility, and resolve conflicts in their testimony." *In re Marriage of Baumgartner*, 237 Ill. 2d 468, 486-87 (2010). In order to reverse the circuit court's finding under this standard of review, the opposite conclusion must be "clearly evident from the record." *In re Christopher S.*, 364 Ill. App. 3d at 86.

¶ 32 There is evidence in the record that Diamond was physically aggressive and that respondent feared for her safety, which respondent argues supports a finding of dependency. There is also ample evidence, however, that respondent failed to provide Diamond with a place to live and showed a lack of concern about getting Diamond the necessary psychological care that she needed. Based on this evidence, we cannot say that the conclusion that Diamond should be adjudged dependent rather than neglected is clearly evident.

¶ 33 CONCLUSION

¶ 34 The record demonstrates that the trial court's finding that Diamond was a neglected minor is not against the manifest weight of the evidence. The judgment of the trial court is accordingly affirmed.

¶ 35 Affirmed.