# Illinois Official Reports

## Appellate Court

> ### *In re M.H.*, 2015 IL App (4th) 150397

| | |
|---|---|
| Appellate Court Caption | In re: M.H., a Minor, THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, v. TYVONNE C. BROWN, Respondent-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-15-0397 |
| Filed | September 28, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Vermilion County, No. 13-JA-82; the Hon. Claudia S. Anderson, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Kimberly Edwards Blakely, of Rossville, for appellant.<br><br>Randall Brinegar, State's Attorney, of Danville (Patrick Delfino and David J. Robinson, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE APPLETON delivered the judgment of the court, with opinion.<br>Justices Turner and Steigmann concurred in the judgment and opinion. |

**OPINION**

¶ 1     Respondent, Tyvonne C. Brown, appeals from a judgment in which the trial court terminated his parental rights to his daughter, M.H., born March 15, 2013. (The mother's parental rights likewise were terminated, but the only appellant in this case is the father.) Respondent argues that the court's underlying factual findings were unproven. Specifically, he argues it was unproven that he was an "unfit person" and that terminating his parental rights would be in M.H.'s best interest. After reviewing the record, we are unable to say that either of those factual findings is against the manifest weight of the evidence. Therefore, we affirm the trial court's judgment.

¶ 2                                      I. BACKGROUND
¶ 3                       A. The Petition for the Termination of Parental Rights
¶ 4     On March 2, 2015, the State filed a petition for the termination of respondent's parental rights to M.H. Paragraph 7 alleged that respondent was an "unfit person" within the meaning of sections 1(D)(a), (D)(b), (D)(r), and (D)(s) of the Adoption Act (750 ILCS 50/1(D)(a), (D)(b), (D)(r), (D)(s) (West 2014)).

¶ 5                                B. The Unfit-Person Hearing
¶ 6     On April 10, 2015, the trial court held an adjudicatory hearing on the State's petition for the termination of parental rights. At the conclusion of the hearing, the court found all the allegations of respondent's unfitness to be proven by clear and convincing evidence.

¶ 7     From the transcript of the adjudicatory hearing, we glean the following relevant evidence.

¶ 8     In November 2012, respondent was placed in the Cook County jail on charges of the aggravated hijacking of a vehicle and armed robbery.

¶ 9     M.H. was born on March 15, 2013, while respondent was in the Cook County jail, awaiting trial.

¶ 10    In July 2013, M.H. was taken into the temporary custody of the Illinois Department of Children and Family Services (DCFS).

¶ 11    Respondent never has met M.H. She has serious medical problems, and the trial court has refused to allow visitation at the jail or in prison.

¶ 12    As of the date of the adjudicatory hearing, respondent had been convicted of the charge of armed robbery; he was in segregation at Danville Correctional Center, to which he had been transferred from Robinson Correctional Center; and his projected date of release from imprisonment was May 11, 2019.

¶ 13                              C. The Best-Interest Hearing
¶ 14    On April 29, 2015, the trial court held a best-interest hearing, at which the State called two caseworkers from the Center for Youth and Family Solutions, Olivia Bray and Kristen Larkin. According to their testimony and a best-interest report written by Larkin, M.H. resided in a specialized foster home in Urbana, Illinois, with her five-year-old half-sister, Si. H.; another foster child; and a single foster parent. The report states that M.H. "has adjusted well to her

current placement and is very bonded with her foster mother. She is up to date on all medical examinations and immunizations."

¶ 15 M.H., who, at birth, tested positive for alcohol and cannabis, has several medical problems. She has hemihypertrophy, a rare congenital disorder that causes one side of the body to grow faster than the other. She has reactive airway disease. She has tremors and a slight hearing loss in the right ear. She also has chronic diarrhea. Before going into foster care, she underwent three surgeries to correct necrotizing enterocolitis. The best-interest report explains:

> "Necrotizing enterocolitis is a condition that is more common in premature infants where portions of the bowel tissue have died causing feeding intolerance, abdominal distension, bloody stools, and increased gastric residuals (food left in the stomach). [M.H.'s] surgeries were to remove parts of the bowels where tissue had died and the final surgery at 1½ months was to reconnect the bowels so the colostomy bag could be removed. [M.H.] has not shown any signs of having any further issue with her bowels other than she can be sensitive to certain foods which causes diarrhea."

¶ 16 Bray testified that the foster mother was "very knowledgeable" about M.H.'s medical conditions and that although the foster mother worked outside the home, she had been transporting M.H. to all her medical appointments. On top of that, the foster mother was willing to adopt both M.H. and Si. H. and was "adamant" about keeping up the relationship between those two girls and their sibling, one-year-old Sa. H., who was in a traditional foster home in Danville–a sentiment the foster parents in Danville shared.

¶ 17 The State rested, and respondent took the stand in his own behalf. He testified he had received a sentence of 17 years' imprisonment at 50% and that his projected year of release was 2019 but that if he got through school, he could be released as early as 2016 or 2017. While at Robinson Correctional Center, he took a "father's class," but the outside company that taught the class expelled him upon learning he was a Class X offender. From Robinson Correctional Center, he had been transferred to Danville Correctional Center, where he still was in segregation. The reason for being in segregation was that he had been in a fight at Robinson Correctional Center. In July 2015, he would be released to the general population, at which point he would avail himself of any and all classes and services that were available. "I can do vocational classes," he testified. "I can do father's class, I can do automotive, anything. I can do any class that's going to help me get out between 2016 and 2017." He had never seen M.H.–but only because the court would not allow visitation. He had "sent birthday cards, letters, as much as [he could]." He had written not only to M.H. but also to her caseworkers, asking how M.H. was doing. He wanted to assume responsibility as M.H.'s father if the court did not terminate his parental rights. He planned to "[g]et back in school when [he got] out," and he would look for employment.

¶ 18                                    II. ANALYSIS
¶ 19                    A. The Finding That Respondent Was an "Unfit Person"
¶ 20 To terminate parental rights, the trial court must make two separate and distinct findings: (1) the biological parents of the child have validly executed a voluntary surrender of their parental rights and a consent to adoption, or, alternatively, it has been proven, by clear and convincing evidence, that the parents are "unfit persons" within the meaning of section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2014)); and (2) it has been proven, by a

preponderance of the evidence, that it would be in the best interest of the child to terminate parental rights and to appoint a guardian and authorize that guardian to consent to an adoption of the child. 705 ILCS 405/2-29(2) (West 2014); *In re D.T.*, 212 Ill. 2d 347, 366 (2004); *In re M.M.*, 226 Ill. App. 3d 202, 209 (1992).

¶ 21     In the present case, respondent has not surrendered his parental rights to M.H. and has not consented to her adoption. Therefore, the first prerequisite to the termination of his parental rights was a finding, by clear and convincing evidence, that he was an "unfit person" within the meaning of any section of the Adoption Act the State cited in its petition (750 ILCS 50/1(D)(a), (D)(b), (D)(r), (D)(s) (West 2014)). The trial court found it had been shown, by clear and convincing evidence, that respondent conformed to all the cited definitions of an "unfit person."

¶ 22     If respondent conformed to only one of the statutory definitions, he was an "unfit person." See *In re F.P.*, 2014 IL App (4th) 140360, ¶ 83. It is not our place to decide whether he is an "unfit person." Instead, our place is to decide whether the trial court made a finding that was against the manifest weight of the evidence when it found him to be an "unfit person" within the meaning of section 1(D)(a), (D)(b), (D)(r), or (D)(s), the sections the State cited in its petition to terminate parental rights. See *In re C.N.*, 196 Ill. 2d 181, 208 (2001). A finding is against the manifest weight of the evidence only if it is "clearly evident," from the evidence in the record, that respondent's conformance to the statutory definition in question was unproven. *Id.* If reasonable minds could disagree whether a given statutory definition was proven by clear and convincing evidence, we will uphold the trial court's finding. See *Kaloo v. Zoning Board of Appeals*, 274 Ill. App. 3d 927, 934 (1995).

¶ 23     With that deferential standard of review in mind (see *In re Diamond M.*, 2011 IL App (1st) 111184, ¶ 31), we will compare the evidence in the record to one of the cited definitions of an "unfit person," the definition in section 1(D)(r) of the Adoption Act (750 ILCS 50/1(D)(r) (West 2014)).

¶ 24     According to section 1(D)(r), a single incarceration makes a parent an "unfit person" under the following circumstances:

"(r) The child is in the temporary custody or guardianship of [DCFS], the parent is incarcerated as a result of criminal conviction at the time the petition or motion for termination of parental rights is filed, prior to incarceration the parent had little or no contact with the child or provided little or no support for the child, and the parent's incarceration will prevent the parent from discharging his or her parental responsibilities for the child for a period in excess of 2 years after the filing of the petition or motion for termination of parental rights." *Id.*

¶ 25     There are four elements in this definition of an "unfit person." Let us consider them one at a time.

¶ 26     The first element is that "[t]he child is in the temporary custody or guardianship of [DCFS]." *Id.* On April 10, 2015, when the trial court held the adjudicatory hearing (the unfit-person hearing) on the State's petition for the termination of parental rights, M.H. was in the temporary custody of DCFS.

¶ 27     The second element is that "the parent is incarcerated as a result of criminal conviction at the time the petition or motion for termination of parental rights is filed." *Id.* The petition to terminate parental rights was filed on March 2, 2015. According to the client service plan filed

- 4 -

on March 6, 2015, which was admitted in evidence, respondent was "currently incarcerated at Robinson Correctional Center as of [December 4, 2014]." Therefore, he was "incarcerated as a result of criminal conviction" at the time the State filed its petition. *Id.*

¶ 28 The third element is that, "prior to incarceration[,] the parent had little or no contact with the child or provided little or no support for the child." *Id.* We note, at the outset, that this element is phrased in the disjunctive: either little or no contact before incarceration *or* little or no support before incarceration. M.H. was born on March 15, 2013, when respondent was in the Cook County jail, awaiting trial, and he never has had any contact with her. The State candidly notes that, in *In re Donald A.G.*, 357 Ill. App. 3d 934, 941 (2005), *rev'd on other grounds*, 221 Ill. 2d 234 (2006), we held: "[T]he State did not, and could not, prove an essential element of section 1(D)(r)–namely, that prior to [the] respondent's incarceration, he had little or no contact with [the child] or provided little or no support for [the child]–because prior to his incarceration, [the child] had not yet been born." Because of the reversal of *Donald A.G.*, however, the States argues that *Donald A.G.* "has little precedential value" and that we should decline to follow it. Actually, we need not reevaluate the holding in *Donald A.G.*, because although M.H. was born *after* respondent went to *jail*, she was born *before* he was "*incarcerated as a result of criminal conviction.*" (Emphasis added.) 750 ILCS 50/1(D)(r) (West 2014). Whenever section 1(D)(r) speaks of "incarceration," it must mean the "incarceration" to which it referred at the beginning: "incarcerat[ion] as a result of criminal conviction." See *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961) ("[A] word is known by the company it keeps ***."). We also note that "incarcerate" is a synonym for "imprison" (The New Oxford American Dictionary 858 (2001)) and that, strictly speaking, being "imprisoned" means being put in a prison, not in a jail. We conclude, therefore, that the record contains evidence of the third element in section 1(D)(r).

¶ 29 The fourth element is that "the parent's incarceration will prevent the parent from discharging his or her parental responsibilities for the child for a period in excess of 2 years after the filing of the petition or motion for termination of parental rights." 750 ILCS 50/1(D)(r) (West 2014). It is impossible to discharge parental responsibilities while being in prison. Respondent testified his projected date of release was May 11, 2019. That will be more than two years after the filing of the petition on March 2, 2015. Thus, the fourth and final element in section 1(D)(r) is fulfilled. It follows that the trial court did not make a finding that was against the manifest weight of the evidence when it found that respondent conformed to the definition of an "unfit person" in section 1(D)(r) of the Adoption Act (*id.*).

¶ 30 In any event, respondent does not make any argument against the trial court's finding that he conformed to section 1(D)(r), and any arguments omitted from the brief are forfeited (Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013)).

¶ 31 ## B. The Finding That It Was in M.H.'s Best Interest
to Terminate Respondent's Parental Rights

¶ 32 Respondent observes that he has written letters to his caseworker asking about M.H. and that he has sent birthday cards to M.H. It is only because of his incarceration that he has been unable to visit M.H. He argues: "Although the foster family was willing to provide permanency for M.H., [he] should be given a chance to establish a bond with M.H. before it can be determined that her best interests require the termination of his parental rights."

¶ 33 　　　　We respect respondent's resolve to be a good father. We do not doubt he cares about M.H. We do not doubt the sincerity of his desire to establish a relationship with her. Nevertheless, the foster parent already has established a relationship with M.H., and whereas respondent is, in a manner of speaking, an unknown quantity as a parent, the foster parent is a known quantity. She has become knowledgeable about M.H.'s complicated medical problems, and she has successfully taken care of M.H. from day to day. See 705 ILCS 405/1-3(4.05)(a) (West 2014). M.H. is attached to her. See 705 ILCS 405/1-3(4.05)(d) (West 2014). She wants to adopt both M.H. and her half-sister, Si. H. See 705 ILCS 405/1-3(4.05)(c), (4.05)(g) (West 2014). When we consider these statutory factors, we are unable to say the trial court made a finding that was against the manifest weight of the evidence when it found that terminating respondent's parental rights would be in M.H.'s best interest. See *In re Deandre D.*, 405 Ill. App. 3d 945, 953 (2010).

¶ 34 　　　　　　　　　　　　　　　III. CONCLUSION

¶ 35 　　　　For the foregoing reasons, we affirm the trial court's judgment.

¶ 36 　　　　Affirmed.