NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2019 IL App (4th) 190434-U

NO. 4-19-0434

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 23, 2019
Carla Bender
4th District Appellate
Court, IL

| | |
|---|---|
| *In re* M.W., a Minor, | ) Appeal from the |
| (The People of the State of Illinois, | ) Circuit Court of |
|       Petitioner-Appellee, | ) Vermilion County |
|       v. | ) No. 18JA5 |
| April W., | ) |
|       Respondent-Appellant). | ) Honorable |
| | ) Thomas M. O'Shaughnessy, |
| | ) Judge Presiding. |

---

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice Holder White and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) By finding that the mother had maintained a less than reasonable degree of interest, concern, or responsibility as to the child's welfare, the circuit court did not make a finding that was against the manifest weight of the evidence.

(2) By finding it would be in the best interests of the child to terminate the mother's parental rights, the circuit court did not abuse its discretion or make a finding that was against the manifest weight of the evidence.

¶ 2    The circuit court of Vermilion County granted the State's petition to terminate the parental rights of a mother and a father to their daughter, M.W., born June 26, 2011. The mother, April W., appeals. We find sufficient evidence in the record to support the circuit court's decision. Therefore, we affirm the judgment.

¶ 3    I. BACKGROUND

¶ 4    A. The Petition to Terminate Parental Rights (March 21, 2019)

¶ 5 The petition for the termination of parental rights alleged that the mother was an "unfit person" within the meaning of section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2018)) in that she had failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare.

¶ 6 B. The Parental Fitness Hearing (May 17, 2019)

¶ 7 1. *The Testimony of Suzzen Borcz*

¶ 8 a. The Referral to New Directions Treatment Center

¶ 9 Suzzen Borcz was a caseworker at the Center for Youth and Family Solutions (Family Solutions), and M.W.'s case had been assigned to her since August 2018.

¶ 10 That month, upon receiving the case, Borcz did two things. First, she had a meeting with the mother, in which she gave the mother a copy of the service plan and discussed with her the services that Family Solutions was recommending, namely, supervised visitation, a parenting course, individual counseling, drug testing, and substance-abuse treatment. Second, Borcz made a referral to New Directions Treatment Center (New Directions), in Danville, Illinois, so that the mother could go there and undergo a substance-abuse assessment. Such an assessment was needed for New Directions to come up with treatment recommendations.

¶ 11 Even though substance-abuse treatment was the most important part of the service plan, considering that the reason M.W. had been made a ward of the court was her parents' use of methamphetamine, and even though Borcz repeatedly reminded the mother of her need to go to New Directions and begin undergoing such treatment, the mother never completed a substance-abuse assessment at New Directions—or anywhere else, as far as Borcz knew.

¶ 12 This noncompliance with the service plan posed an obstacle to another recommended service, individual counseling, because substance-abuse treatment had to be

successfully completed—the client had to be "clean"—before it was possible even to make a valid preliminary assessment to inform the counseling. Consequently, the counseling goal likewise was unreached.

¶ 13                              b. Drug Testing

¶ 14        According to the service plan, the mother was supposed to call Family Solutions every week, throughout the pendency of the case, to find out if she should come in for a drug test. The mother did no "drug drops" for Family Solutions.

¶ 15        Sometimes, though, the mother submitted to drug-testing when she was in court— but not always. She disobeyed a court order on April 11, 2019, to provide a sample. The court hearing preceding that one, if Borcz remembered correctly, was in November 2018, and the mother submitted a sample at that time. It tested positive for methamphetamine.

¶ 16        So, demonstrating sobriety was another unreached goal.

¶ 17              c. The Mother's Preference to Undergo Inpatient Treatment

¶ 18        In December 2018 or January 2019, the mother started talking about trying to find inpatient treatment either in Champaign, Illinois, or at Hour House in Charleston, Illinois. When Borcz met with the mother in February 2019 for an annual case review, she, Borcz, called Hour House, but no bed was available at that time. Hour House said that the mother should keep calling until a bed became available.

¶ 19        In early April 2018, still reporting frustration at getting substance-abuse services, the mother asked Borcz to refer her to Rosecrance Treatment Center (Rosecrance) in Champaign, Illinois. Accordingly, Borcz sent a referral packet to Rosecrance. About a week later, Borcz followed up with a call to Rosecrance, which informed Borcz that (1) an additional item was needed in the referral packet and (2) the mother had not yet made any contact with Rosecrance.

¶ 20    d. Visitation and Keeping in Contact With the Agency

¶ 21    The mother cooperated by faithfully attending visitations and keeping in contact with Family Solutions.

¶ 22    2. *The Mother's Testimony*

¶ 23    After the circuit court granted the State's unopposed request to take judicial notice of the prior orders in the case, the mother took the stand and testified on her own behalf.

¶ 24    She testified she was 28 years old and that she tried to go to outpatient treatment at New Directions but missed two or three appointments there—she just forgot about the appointments—and New Directions had such a long waiting list that when you missed an appointment, the rescheduled appointment was two months away. Finally, the mother attended an appointment at New Directions and began undergoing a substance-abuse assessment, but she left halfway through the assessment because she had a visitation to attend. So, she never completed a substance-abuse assessment at New Directions.

¶ 25    From the beginning of the case, though, the mother had been trying to obtain inpatient treatment at Hour House, but no beds were available there. She also kept calling Rosecrance and The Pavilion Behavioral System in Champaign (The Pavilion), but no beds were available at the Pavilion, and when she stopped by Rosecrance, the referral packet that Borcz had sent was missing a document and Borcz would not return Rosecrance's call.

¶ 26    While the mother was trying to get into Hour House, it referred her to outpatient treatment. She chose not to attend outpatient treatment, however. When asked why, she answered as follows:

"A. I mean, I don't know. I was really trying to go into inpatient because it's—it's more like sobriety around me and, like, even with that outpatient, it's not going to help.

Q. Have you ever attended outpatient treatment?

A. No.

Q. So how do you know it's not going to help?

A. I mean, because I'm still going to be surrounded with the same people."

¶ 27　　Nevertheless, the mother, according to her testimony, had completed some online courses on substance abuse and parenting. It took six weeks, though, for the certificates of completion to arrive in the mail, and she did not have them yet.

¶ 28　　　　　　　　　　　　3. *The Circuit Court's Finding*

¶ 29　　The circuit court found the State had proved, by clear and convincing evidence, that the mother had failed to maintain a reasonable degree of interest, concern, and responsibility as to M.W.'s welfare. In so finding, the court acknowledged that the mother had consistently visited with the child and had kept in contact with the agency. Even so, the court observed, this case was about substance abuse, and from the first day, the mother had been referred for a substance-abuse assessment, which, according to her own testimony, she had failed to complete. The court did not believe her testimony about her efforts to obtain inpatient treatment, and the court noted that she had failed to demonstrate sobriety.

¶ 30　　　　　　　　　C. The Best Interest Hearing (June 26, 2019)

¶ 31　　Borcz was the only witness to testify in the best interest hearing. According to her testimony, M.W. had just turned eight and was living in a "fictive kin foster home" with someone who had always been assumed to be her paternal grandmother. ("[M.W.] believed the foster

parent's son to be her father.") M.W. had been in this foster home for the entirety of the case. The foster home, Borcz opined, was "safe and appropriate," and M.W. was attached to the foster parent, who wanted to adopt her. The two of them had community ties through a church, and M.W., who was doing well in elementary school, had expressed a desire to continue living with this woman whom she regarded as her grandmother. Only M.W. and the foster parent lived in the foster home, but M.W. had some half-siblings, who were "in the process of being placed possibly a couple of hours away from here," and the foster parent had "expressed an interest in maintaining contact between [M.W.] and her half siblings."

¶ 32        The mother had been keeping in contact with the foster mother, to monitor how M.W. was doing in school, and the mother still was faithful in attending visitation. In fact, Borcz testified there were never any "issues" with the mother other than "drug use." To the best of Borcz's knowledge, the mother was "still using"; at least, Borcz had received no information to the contrary.

¶ 33        The circuit court decided it would be in the best interests of M.W. to terminate both the mother's and the father's parental rights. Acknowledging the continuing bond between the mother and M.W., the court nevertheless reasoned as follows:

> "This case started as a substance abuse case. It's still a substance abuse case. And her need for permanence outweighs any time that it may take you to get clean and sober and she can't wait. She shouldn't have to wait. So I hope that you are able to get clean, get sober, because I think that is in your best interests, but today the focus is on her best interests."

¶ 34                                 II. ANALYSIS

¶ 35                          A. The Finding of Parental Unfitness

¶ 36 To terminate parental rights to a child, a trial court must make two distinct findings in separate hearings: (1) the biological parents of the child have validly executed a voluntary surrender of their parental rights and a consent to adoption, or, alternatively, it has been proven, by clear and convincing evidence, that the parents are "unfit persons" within the meaning of section 1(D) of the Adoption Act (750 ILCS 50/1 (West 2018)) and (2) it has been proven, by a preponderance of the evidence, that it would be in the best interests of the child to terminate parental rights and to appoint a guardian, authorizing the guardian to consent to an adoption of the child. 705 ILCS 405/2-29(2) (West 2018); *In re M.H.*, 2015 IL App (4th) 150397, ¶ 20.

¶ 37 In the present case, the mother did not surrender her parental rights to M.W.; nor did she consent to her adoption. Therefore, the first prerequisite to the termination of her parental rights was a finding, by clear and convincing evidence, that she was an "unfit person" within the meaning of the section of the Adoption Act that the State cited in its petition, section 1(D)(b) (750 ILCS 50/1(D)(b) (West 2018)). See *M.H.*, 2015 IL App (4th) 150397, ¶ 20.

¶ 38 Section 1(D)(b) provides as follows:

" 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following ***:

(b) Failure to maintain a reasonable degree of interest, concern[,] or responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2018).

¶ 39 Noncompliance with a service plan, a repeated failure to obtain treatment for a drug addiction, and a continued use of illegal drugs all have been held to justify a finding that the parent maintained a less than a reasonable degree of interest, concern, or responsibility as to the child's welfare. *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24. This has been true even though, on

the positive side of the ledger, the parent maintained contact with the child and showed an interest in reunifying with the child. See *id.* ¶ 27.

¶ 40 "[S]imply because a parent demonstrates some interest or affection toward her child does not render her fit under this ground; rather, her interest, concern, and/or responsibility must be reasonable." *Id.* ¶ 24. Arguably, the mother demonstrated a less than reasonable degree of responsibility as to M.W.'s welfare when for some seven months she failed to complete the substance-abuse assessment that was necessary for her to obtain treatment for her methamphetamine addiction. See *id.* ¶ 24 ("[A]ny of [the] three elements [in section 1(D)(b)]— the failure to maintain a reasonable degree of interest *or* concern *or* responsibility as to the child's welfare—may be considered on its own as a basis in determining whether the parent is unfit." (Emphases in original.)). Her excuse for this failure made no sense. The inpatient treatment on which she insisted in lieu of outpatient treatment could have been no permanent solution to the problem of social exposure to methamphetamine. The users would have still been there after the mother was discharged from inpatient treatment. At least outpatient treatment might have offered suggestions on how the mother possibly could have reordered her life so as to eliminate her exposure to methamphetamine.

¶ 41 So, we can understand why the circuit court was unconvinced by the mother's excuse for failing to undergo a substance-abuse assessment. Such an assessment was necessary to decide what kind of rehabilitative treatment the mother needed—whether, for example, the treatment should be inpatient or outpatient. In sum, then, by finding that the mother met the definition of an "unfit person" in section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2018)), the circuit court did not make a finding that was against the manifest weight of the evidence. See *Nicholas C.*, 2017 IL App (1st) 162101, ¶ 25.

¶ 42                              B. The Best-Interest Finding

¶ 43         The mother argues that because she "was having consistent and regular visits with the minor child" and because "visits were appropriate," it was not in the best interests of the child to terminate the mother's parental rights.

¶ 44         The mother had a relationship, a bond, with M.W., but the existence of a mother-child bond "does not automatically insure that *** the child's best interests will be served by that parent." *In re J.B.*, 198 Ill. App. 3d 495, 499 (1990). There are additional factors for the trier of fact to consider, such as "the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures." 705 ILCS 405/1-3(4.05)(g) (West 2018). The circuit court decided that M.W.'s "need for permanence outweighs any time that it may take [the mother] to get clean and sober and she can't wait." Young as she is, M.W. senses where permanence, stability, and security can be found (see *id.* § 1-3(4.05)(d)(ii), (d)(iii), (g)), and that is with the foster parent, to whom M.W. likewise is emotionally attached (see *id.* § 1-3(4.05)(d)(i)) and who wishes to adopt M.W. (see *In re Tashika F.*, 333 Ill. App. 3d 165, 170 (2002)). Therefore, we are unable to say that by finding it would be in M.W.'s best interests to terminate the mother's parental rights, the circuit court abused its discretion or made a finding that was against the manifest weight of the evidence. See *In re Janira T.*, 368 Ill. App. 3d 883, 894 (2006).

¶ 45                                    III. CONCLUSION

¶ 46         For the foregoing reasons, we affirm the circuit court's judgment.

¶ 47         Affirmed.