NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250996-U

NO. 4-25-0996

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 13, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* K.G., a Minor, | ) | Appeal from the |
| (The People of the State of Illinois, | ) | Circuit Court of |
|     Petitioner-Appellee, | ) | McDonough County |
|     v. | ) | No. 22JA21 |
| Michael G., | ) | |
|     Respondent-Appellant). | ) | Honorable |
| | ) | Heidi A. Benson, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Vancil and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's determination that it was in the minor child's best interest to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 2    The State filed a motion seeking termination of respondent Michael G.'s parental rights as to his daughter K.G., a minor (born in 2019). After hearing, the trial court found respondent unfit and that termination of his parental rights was in K.G.'s best interest, so it granted the motion and terminated respondent's rights. On appeal, respondent does not challenge the unfitness determination but argues the finding regarding the best interest of the child was based on insufficient evidence. We affirm.

¶ 3                                        I. BACKGROUND

¶ 4                                        A. Initial Proceedings

¶ 5    In September 2022, the Illinois Department of Children and Family Services

(DCFS) received a report expressing concerns about the health and safety of K.G. In October 2022, the State filed a petition for temporary custody pursuant to section 2-10 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-10 (West 2022)) and a petition for adjudication of wardship of K.G. pursuant to section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2022)), alleging that the child was neglected due to being in an injurious environment. The biological mother, who had tested positive for controlled substances on multiple occasions, ultimately surrendered her parental rights and is not involved in this appeal. As to respondent, the petitions alleged he

> "exhibited erratic behavior and admitted to methamphetamine sales and use to family members while failing to provide samples for drug testing as directed by his caseworker at a time when he was either in the caretaking role of the minor or under a safety plan following the minor's removal from the parental home."

The trial court found probable cause for the allegations and granted the petition for temporary custody. DCFS placed K.G. with Kylin B. and her husband; Kylin is respondent's adult daughter and K.G.'s older half-sister.

¶ 6        In February 2023, K.G. was adjudicated neglected. DCFS maintained custody of K.G. and created respondent's service plan. In addition to visitation with K.G., he was to begin drug screening, mental health and substance abuse counseling, a parenting course, and a domestic violence course due to an alleged incident involving K.G.'s biological mother.

¶ 7        In March 2023, the trial court noted in the record that since February, respondent had failed to cooperate with the DCFS guardianship administrator, including by not providing samples for drug testing, and that he was unfit to care for the minor. The court entered a dispositional order making K.G. a ward of the court, setting a goal to return her home in 12 months, and continuing to place custody and guardianship of the child with DCFS. Respondent was

admonished to comply with the service plan or risk termination of his parental rights. Over approximately the next two years, the court held permanency review hearings, in which the court inquired into respondent's progress with the DCFS service plan.

¶ 8                                    B. Fitness Hearing

¶ 9            In August 2024, the State petitioned for termination of respondent's parental rights pursuant to section 1(D)(m)(ii) of the Illinois Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2024)), alleging respondent failed to make reasonable progress toward the return of K.G. during any nine-month period following the adjudication of neglect. During the fitness hearing in May 2025, the trial court considered the record from the statutory nine-month period (April 2023 to January 2024). After a hearing on fitness, the court determined no progress had been made and found that respondent was unfit.

¶ 10                                C. Best-Interest Hearing

¶ 11           In July 2025, when the trial court convened for the hearing on whether termination of parental rights was in the best interest of K.G., respondent did not appear due to alleged health issues, and the matter was continued. Respondent did not provide medical documentation for this absence. Later that month, the court reconvened, and respondent again initially did not appear because he was receiving treatment in the hospital and technical difficulties prevented him from appearing remotely. The court noted that "anybody can go to the emergency room for any reason, and this is the second time in a row that this has happened. It appears to the Court that perhaps this is a delay tactic." Reportedly, as the hearing proceeded without him, he took the IV out of his arm at the hospital and traveled to the courtroom, arriving late.

¶ 12           During the hearing, the State called Amy Strubhar, the caseworker from Children's Community Services, who testified as follows. From October 2022 to January 2025, K.G. was in

the care of her foster parents. She tells her foster mom that she loves her, calling her either "mom" or "sissy," with the former becoming more frequent as time passes. She refers to her foster father as either "dad" or "Dalton." Her foster parents were, as of the date of the hearing, expecting their first child, and they indicated a willingness to provide K.G. with permanency.

¶ 13    Strubhar's testimony further showed that K.G. has developmental, psychological, and physical delays, as well as other special needs, including torticollis, congenital defects of the spinal cord, hydrocephalus, attention-deficit/hyperactivity disorder, and sleep disturbances. Strubhar indicated that K.G. needed transportation and dependability to meet her unique needs, and the failure to have that consistency would be a detriment to her.

¶ 14    The State entered into evidence, without objection, the best-interest report created by Strubhar. The report indicated that K.G.'s needs were met while in the care of her foster parents. Specifically, while in foster care, she had received appropriate medical care and had kept up to date on immunizations. She attended school, where she had an individualized education plan. Her foster parents remained actively engaged with the school, attending in-person meetings and actively advocating for K.G. At home, K.G. had her own bedroom, with a bed, dresser, television, toys, and LED lights. She spent time in the shared spaces of the house and had a dog she loves. She had appropriate clothing and was clean and well groomed.

¶ 15    The best-interest report indicated that respondent partially complied with the service plan. He completed his domestic violence class and his parenting class. He also visited K.G. for 63 of the 71 scheduled visits, missing 8 visits due to illness or COVID-19 exposure. During their time together, he connected with her and was able to demonstrate appropriate parenting skills. However, at times, he purportedly struggled to get K.G. to listen to him.

¶ 16    The report further indicated respondent allegedly completed a mental health

assessment, substance abuse assessments, and weekly therapy over the course of numerous months. However, other than an e-mail showing remission for a stimulant use disorder in July 2024, he did not provide a release form or proof he completed counseling. He scheduled, but did not attend, two intake assessments in 2025. Furthermore, he notably failed to appear for 81 of his 94 drug tests. Of the 13 tests he completed, he obtained a positive result for amphetamines twice and methamphetamine once. He refused one test in July 2024 because he said he would "drop dirty." Contradictorily, he reported to his counselor that he had not used since October 2023 and was allegedly in remission. In November 2024, he attended the first 4 days of a 30-day inpatient program, leaving after concluding he had been detoxified. Moreover, the report briefly described respondent's health issues, including diabetes, "a gray nodule" on his lung, and neuropathy that makes his hands and feet numb. Respondent had not been working regularly due to his health concerns. While he had a vehicle, he allegedly did not have money for gas, and he was either unable or unwilling to use the gas cards DCFS made available.

¶ 17        When respondent took the stand, he indicated that he understood missed drug tests would be treated as a positive result, but he did not appear for them because he lacked money for fuel. He further testified that he cared for K.G. during the first few years of her life; K.G. called him either "Michael" or, when she is not coached otherwise, "dad"; and once she was placed with her foster parents and visitation was established, he visited her once per week or once per month, depending on the goal, and had a bond with her. He said K.G. lit up every time he visited, and that during visits the two cuddle, watch television, and play. In the past, he had cooked for her and provided her with fresh fruit. He testified that he would ensure that she would continue to attend school in Rushville, Illinois, even though he lived in Macomb, Illinois, and a day care facility was nearby. He noted that if parental rights were to continue, K.G.'s relationship with her foster parents

- 5 -

could, in theory, continue because of the family connection, despite the relationship between respondent and the foster parents having recently broken down.

¶ 18     The trial court ultimately found that termination of respondent's parental rights was in K.G.'s best interest, citing consideration of the factors set forth in section 1-3(4.05) of the Act (705 ILCS 405/1-3(4.05) (West 2024)) and K.G.'s significant needs, respondent's health challenges, his missed drug drops, and the track record of the foster parents in providing for K.G. The court noted respondent may love K.G. and he could have a relationship with her even if he is not her father.

¶ 19     The trial court ordered respondent's parental rights terminated.

¶ 20     This appeal followed.

¶ 21                              II. ANALYSIS

¶ 22     On appeal, respondent argues the trial court's best-interest determination was against the manifest weight of the evidence. He does not challenge the court's unfitness determination.

¶ 23     "[I]t is well established that the paramount consideration in all guardianship and child custody cases is the best interest of the child." *In re Violetta B.*, 210 Ill. App. 3d 521, 533 (1991); see *In re K.P.L.*, 304 Ill. App. 3d 481, 487-88 (1999) ("The primary consideration in any custody dispute is the best interests and welfare of the child."). The best-interest factors are provided by statute:

> "(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;
>
> (b) the development of the child's identity;
>
> (c) the child's background and ties, including familial, cultural, and

- 6 -

religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals ***;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures, siblings, and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2024)).

¶ 24    A trial court's determination as to the best interest of the child will not be reversed on appeal unless it is against the manifest weight of the evidence. *Violetta B.*, 210 Ill. App. 3d at 536. The court's decision will be found to be "against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16. This is a highly deferential

standard of review because "the trial court is in a much better position than is this court to observe the witnesses, assess credibility, and weigh the evidence." *In re T.B.*, 215 Ill. App. 3d 1059, 1062 (1991). Consequently, we will not substitute our judgment or "overturn the trial court's findings merely because [we] might have reached a different decision." *Id.*

¶ 25     Here, respondent argues that the trial court erred "because of the important bond" he has with K.G. We do not doubt respondent's love for his daughter. Evidence shows he attended a majority of the scheduled visits with K.G., missing only a handful due to illness or COVID-19 exposure, and he connected with her during those visits. Furthermore, there is evidence of K.G. reciprocating his affection. She called him "dad" or "Michael," was excited to see him during visits, and appeared somewhat bonded to him. However, the mutual affection between a biological parent and child is merely one part of the analysis. *In re J.B.*, 198 Ill. App. 3d 495, 499 (1990) (existence of a father-child bond "does not automatically insure that *** the child's best interest will be served by that parent."); *In re M.C.*, 2018 IL App (4th) 180144, ¶ 30 (" 'In custody cases, a child's best interest is and must remain inviolate and impregnable from all other factors, including the interests of the biological parents.' " (quoting *In re Ashley K.*, 212 Ill. App. 3d 849, 879 (1991))); *In re D.T.*, 212 Ill. 2d 347, 364 (2004) ("[T]he parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life.").

¶ 26     Additionally, respondent points to evidence of his parenting skills. Indeed, he completed a domestic violence course and an online parenting course. He was observed engaging with K.G. appropriately, cooking for her, and giving her fresh fruit that she loves. However, these examples of parenting do not dictate a different result. The mere existence of some supporting evidence for respondent's position is not enough to show the trial court's best interest determination was against the manifest weight of the evidence. See *In re Custody of H.J.*, 2021 IL

App (4th) 200401, ¶¶ 23-24 (stating, in a case with evidence pointing in both directions, the appellate court would affirm because of the highly deferential manifest weight standard of review); *Tate v. Illinois Pollution Control Board*, 188 Ill. App. 3d 994, 1022 (1989) (citing *Jackson v. Board of Review of the Department of Labor*, 105 Ill. 2d 501, 506 (1985)) ("A reviewing court is not in a position to reweigh the evidence, but can merely determine if the decision is against the manifest weight of the evidence.").

¶ 27 Here, numerous other considerations support the trial court's best-interest determination. For example, respondent has a history of drug abuse, which would affect K.G. negatively. He refused or failed to provide samples for drug testing, as directed by his caseworker, on a significant number of occasions. He returned positive results for amphetamines and methamphetamine and indicated at least once when refusing a test that he would "drop dirty." He understood that missing drug tests could be treated as a positive test. Nevertheless, throughout the more than two years of these proceedings, respondent failed to reform his behavior.

¶ 28 Furthermore, K.G.'s prospects with her foster parents were more stable. She had resided with them for approximately half of her life, in a home with her own room and possessions. She made use of shared spaces in the house and referred to her foster parents as "mom" and "dad." K.G.'s foster mother is a member of the same biological family and expressed a willingness to provide permanency. She ensured that K.G. received necessary medical care and attended school, where she received extra support for her special needs. In other words, "the foster parent already has established a relationship with [the minor child], and whereas respondent is, in a manner of speaking, an unknown quantity as a parent, the foster parent is a known quantity." *In re M.H.*, 2015 IL App (4th) 150397, ¶ 33.

¶ 29       Respondent additionally argues that the trial court inadequately considered his financial constraints and improperly focused on his health. But the facts show that these considerations were appropriate. Respondent testified that he was not regularly working due to his health concerns, making money tight. He was not employed, could not afford gas, and ran out of gas while driving. He missed drug tests, court hearings, and other appointments. Regardless of the sympathetic reasons that may underly his failure to meet various obligations, such shortcomings support the court's ruling. See *In re D.T.*, 212 Ill. 2d at 364 ("Following a finding of unfitness, *** the focus shifts to the child. The issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.)). Particularly given K.G.'s special needs, the court fairly questioned whether respondent could properly care for her.

¶ 30       Respondent also argues that the trial court made an unfair comparison between K.G.'s mother, who completed her drug testing without a vehicle, and respondent, who failed to complete his testing with a vehicle. His point is that, though he may have a vehicle, it is useless without fuel. However, not obtaining seemingly available fuel cards without a clear explanation suggests he failed to take the steps necessary to act in K.G.'s best interest.

¶ 31       Finally, respondent argues that the trial court inadequately considered the "family's unique circumstances." Specifically, because K.G.'s foster parents are respondent's older daughter and son-in-law, he suggested their relationship with K.G. could continue even if he had parental rights, creating a "best of both worlds" scenario. However, respondent noted his relationship with the foster parents had recently broken down. Further, his argument works both ways; the court indicated that upon termination of his parental rights, respondent may still be able to have a relationship with K.G. due to the family connection to the foster parents.

¶ 32 Overall, the record substantiates the trial court's reliance on K.G.'s significant needs, respondent's health challenges, concerns about his continued drug use, and the foster parents' ability to provide for K.G. While there is some evidence in the record supporting respondent's position, that is not enough, in light of the evidence as a whole, and the court's ruling was not unreasonable or arbitrary.

¶ 33                                III. CONCLUSION

¶ 34        For the reasons stated, we affirm the trial court's judgment.

¶ 35        Affirmed.