2021 IL App (1st) 210825-U

FIFTH DIVISION
November 12, 2021

No. 1-21-0825

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In re* M.F.Y., a minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County. |
| | ) | |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | No. 20 JA 1183 |
| | ) | |
| v. | ) | |
| | ) | |
| A.H., | ) | Honorable |
| | ) | Jennifer Payne, |
| Respondent-Appellant). | ) | Judge, presiding. |
| | ) | |

PRESIDING JUSTICE DELORT delivered the judgment of the court.
Justices Hoffman and Connors concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm the circuit court's order and finding of neglect. Respondent waived any argument as to the sufficiency of the petition and the circuit court did not err in weighing the evidence.

¶ 2                              BACKGROUND

¶ 3    On August 21, 2020, the State filed a petition to adjudicate wardship of M.F.Y., born January 26, 2003. The petition alleged that respondents A.H. and H.Y. were M.F.Y.'s mother and

father, respectively. The petition alleged that, due to a lack of care (705 ILCS 405/2-3(1)(a) (West 2020)) and the existence of an injurious environment (705 ILCS 405/2-3(1)(b) (West 2020)), M.F.Y. was neglected under the meaning of the Juvenile Court Act of 1987 (the Juvenile Court Act). In support of that contention, the State pleaded the following allegations:

"[M.F.Y.] was previously adjudicated a ward of the court with findings of abuse and neglect having been entered on or about May 27, 2015. [M.F.Y] was returned home to the care of her mother on or about August 14, 2018. On or about February 14, 2019, the court closed the case with the mother having custody. Mother has two other children in the care of the Department [of Child and Family Services] with findings of abuse and neglect having been entered. [A.H.] is currently not cooperating with services as to her children in care. [M.F.Y.] has been diagnosed with bipolar disorder. [M.F.Y.] was psychiatrically hospitalized in March of 2020. At the time of discharge, [A.H] initially refused to allow [M.F.Y.] to return home. Since that time, [A.H.] has on multiples occasions attempted to have [M.F.Y.] admitted to the hospital for acute psychiatric care. When told that the minor does not meet the criteria for admission, [A.H.] has on at least two occasions refused to allow the minor to return home with the most recent incident occurring on or about August 18, 2020. [A.H] and [H.Y.] are unwilling to allow [M.F.Y.] to return home at this time. [A.H] and [H.Y.] are unable to develop a care plan for the minor."

¶ 4    The circuit court entered an order placing M.F.Y. in the temporary custody of the Illinois Department of Child and Family Services (DCFS) and appointed the Cook County Public Guardian as M.F.Y.'s guardian *ad litem* (GAL). The court also entered an order defaulting H.Y. for failure to appear; he is not a party to this appeal.

¶ 5    On November 17, 2020, the GAL filed a motion "to provide immediate placement consistent with the minor's needs." The motion alleged that M.F.Y. had initially been placed with a foster home but was psychiatrically hospitalized on October 24, 2020. Despite being ready for discharge as of October 30, M.F.Y.'s assigned case manager had been unable to find a suitable foster home for her as of the date of the motion.

¶ 6    On June 24, 2021, A.H. filed a supplemental petition for adjudication of wardship, requesting that the court find that M.F.Y. was dependent through no fault of her parents.[1] See 705 ILCS 405/2-4(1)(c) (West 2020). On June 28, the circuit court held an adjudicatory hearing on the petitions.

¶ 7    The State introduced two sets of medical records without objection. One set of records related to M.F.Y.'s hospitalization in March 2020. The records indicated that M.F.Y. was admitted to the hospital "for further stabilization and treatment after endorsing homicidal ideations towards her mom and experiencing auditory hallucinations with commands to hurt herself." According to the records, M.F.Y. "reported that she had been noncompliant with her medications *** and explained that her mother did not get the prescriptions." The records also indicated that M.F.Y. had "a history of trauma including sexual and physical abuse." The records showed that A.H. "was involved actively in the course of treatment by participating in family sessions and clinical team staffings." A.H. initially reported that she was unwilling to have M.F.Y. return home, so M.F.Y. was discharged to Youth Outreach Services. A.H. later agreed to have M.F.Y. return home.

¶ 8    The other set of medical records related to M.F.Y.'s August 18, 2020, emergency room visit. The records noted that M.F.Y. had previously been diagnosed with bipolar disorder. The

---

[1] The record on appeal does not include a copy of the supplemental petition. The gist of the petition, however, is apparent from the report of proceedings.

records indicated that M.F.Y. "had a fight [with A.H.] who called the police stating that she was acting out." A.H. also reported that she had called H.Y. and M.F.Y.'s former crisis therapist.

¶ 9     According to the records, A.H. called the police after having a verbal argument with M.F.Y. during which M.F.Y. "threw a glass on the ground outside toward her." A.H. reported that M.F.Y. "threatened to kill her and burn the house down." The records continued, "[A.H.] stated that this 'is not a bipolar episode' and that [M.F.Y.] is just 'acting out.' " Although A.H. intended "to have [M.F.Y.] arrested," emergency responders took M.F.Y. to the hospital due to her medical history. The records noted that A.H. refused to accompany M.F.Y. to the hospital, even though she was "aware that DCFS [would] have to be contacted for abandonment." A.H. reported that she feared for her life.

¶ 10    According to the records, M.F.Y. was compliant with her medications and was "calm [with] good insight and judgment." M.F.Y. also "did not voice any homicidal threats towards mother," and denied having any "hallucinations, delusion, and illusions." M.F.Y. did not meet the requirements for admission, but neither A.H. nor H.Y. were willing to pick her up.

¶ 11    The parties also stipulated to the following evidence. If called to testify, a crisis worker would testify that M.F.Y. "was brought to the hospital emergency room on May 16, 2020, for psychiatric evaluation." She would testify that M.F.Y. did not meet the criteria to be admitted and was ready to be discharged that same day. She would testify that A.H. did not pick up M.F.Y. from the hospital, so M.F.Y. had to be transferred to a shelter. She would testify that A.H. "was supposed to bring [M.F.Y.'s] medication to the hospital so [M.F.Y.] could be transferred to the shelter." However, A.H. did not deliver the medication, so the hospital had to provide M.F.Y. with medication to take with her to the shelter.

¶ 12    If called to testify, Joann Rhodes, a DCFS investigator, would testify that she attempted to find a placement for M.F.Y. in May of 2020 because she could no longer stay at the shelter. She would testify that M.F.Y. only had a three-day supply of medication, and that she would be discharged from the shelter "once the medication ran out." Rhodes would testify that M.F.Y., at her own request, was placed with her father, H.Y. She would testify that she later spoke to A.H. to inquire why A.H. had not sent M.F.Y.'s medication to H.Y. Rhodes would testify that, in response to that inquiry, A.H. "stated that she needed the money to move." Rhodes would testify that she "indicated [A.H.] for inadequate supervision and lockout."

¶ 13    If called to testify, Julia Lake, a DCFS investigator, would testify that on August 18, 2020, M.F.Y. "was at South Suburban hospital and was ready for discharge." She would testify that A.H. would not allow M.F.Y. to return home "due to [M.F.Y.'s] outbursts, aggressive behavior, and promiscuous behavior." Lake would testify that on August 19, DCFS took protective custody of M.F.Y. because neither A.H. nor H.Y. were willing to take custody of her and because "there was no care plan."

¶ 14    If called to testify, Mindy Atunez, a caseworker with Volunteers of America, would testify that she was assigned to M.F.Y.'s siblings who were in DCFS custody. She would testify that A.H. "was not compliant with random urine drops or visitation with" her other children, and that her visitation with the children had been suspended. Atunez would testify that M.F.Y. would benefit from a residential placement.

¶ 15    The State, the GAL, and A.H. all rested without introducing any further evidence. The State argued that the evidence was sufficient to establish that M.F.Y. was neglected. In particular, the State noted that the evidence showed that A.H. twice failed to deliver M.F.Y.'s medication to her and that A.H. had previously failed to have M.F.Y.'s prescription filled. When asked for an

explanation, A.H. had responded that she needed the money to move. The State also pointed out that A.H. had refused to accompany M.F.Y. to the hospital in August 2020 and had refused to pick her up.

¶ 16    The GAL also argued that the State had met its burden. The GAL further argued that A.H. had not made significant efforts to get M.F.Y. help. Rather than seek help, the GAL pointed out, A.H. had attempted to have M.F.Y. arrested for "acting out."

¶ 17    Counsel for A.H. argued that the evidence supported a finding of no-fault dependency rather than neglect. He argued that A.H. did not allow M.F.Y. to return home because she was afraid of M.F.Y. He argued that A.H.'s fear was justified by M.F.Y.'s history of homicidal ideations, auditory hallucinations, attacks, and verbal threats. Counsel argued that this is one of many cases in which minors do not "need to be in a psychiatric hospital and yet *** they're also not ready for a foster home or to be in somebody's house, and that would include a parent's house." Counsel concluded that it would be unjust to enter a finding of neglect in this situation. He contended that M.F.Y.'s behavior and condition made it difficult or impossible for DCFS to find an appropriate placement for her. Why then, he asked, should A.H. be punished for similarly being unable to care for M.F.Y.?

¶ 18    In rebuttal, the State argued that A.H.'s fear of M.F.Y. or her inability to care for M.F.Y. did not negate her parental duties. A.H.'s failure to deliver M.F.Y.'s medication, the State contended, was inexcusable neglect.

¶ 19    The court asked the parties whether the evidence could support a finding of both neglect *and* no-fault dependency. The State and GAL argued that those findings are mutually exclusive. Counsel for A.H. argued that the court could find both neglect and dependency though no fault of

the parents. The court stated that "[t]here is evidence to support both" and requested that the parties submit caselaw on the issue. The court then took the petitions under advisement.

¶ 20     At the next court date, the court stated that its research had led it to conclude that, under the facts of this case, neglect and no-fault dependency were mutually exclusive. Based on the evidence, the court made a finding of neglect. The court noted that "had the only evidence of neglect in this case been that the mother refused or failed to pick up [M.F.Y.] from the hospital or refused to allow her to return home, I think under that scenario I would have found [no-fault dependency]." However, the court went on, the evidence showed that A.H. did not cooperate with the hospital staff to find M.F.Y. an appropriate placement. The court concluded that the failure to provide M.F.Y.'s medication was an act of neglect, "especially when a child is hospitalized and has very serious psychiatric issues." The court stated that A.H.'s statement that she did not deliver the medication because she needed the money implied that A.H. had sold the medication rather than deliver it to M.F.Y. The court also pointed out that the evidence showed that A.H.'s other children were in State custody and that she was not compliant with urine testing.

¶ 21     The court then proceeded to a dispositional hearing, during which Atunez and A.H. testified. The court adjudicated M.F.Y. a ward of the court and proceeded to a hearing on permanency. Atunez testified again, as did M.F.Y. The court found that the appropriate goal was "substitute care pending independence." M.F.Y., the court observed, had turned 18 since the State's petition was filed and did not want to return home. This appeal follows.

¶ 22                                    ANALYSIS

¶ 23     Initially, we note that M.F.Y. turned 18 years old during the pendency of this case. However, the Juvenile Court Act protects "any *** minor 18 years of age or older for whom the court has made a finding of probable cause to believe that minor is abused, neglected, or dependent

7

*** prior to the minor's 18th birthday." 705 ILCS 405/2-3(1)(a)(b)(West 2020). The State's petition alleged that M.F.Y. was neglected prior to her 18th birthday, and the Juvenile Court Act allows her to remain a ward of the State until her 21st birthday. 705 ILCS 405/2-31(a) (West 2020).

¶ 24    A.H. raises two claims of error in her brief. First, she contends that her due process rights were violated because the court relied on unpleaded allegations in support of its neglect finding. Second, she argues that the court erred in weighing the evidence.

¶ 25    A.H. contends that the State's petition did not give her adequate notice that the State was seeking a neglect finding based on her failure to hand over M.F.Y.'s medication. The petition, she points out, does not include any allegations about the medication. Nevertheless, the failure to hand over the medication was central to the State's argument at the hearing, and the court explicitly relied on those facts in making its finding of neglect.

¶ 26    The State and GAL argue that A.H. waived any argument that the petition was not adequately pleaded. They point out that A.H. never raised the issue before the circuit court. Moreover, A.H. stipulated to the evidence that she had not delivered M.F.Y.'s medicine. Consequently, they argue, she may not now contend that she was not on notice about the nature of the State's claims.

¶ 27    "Ordinarily, the sufficiency of a complaint cannot be raised for the first time on appeal, and failure to raise the issue in the trial court results in a waiver on appeal." *In re Carlenn H.*, 186 Ill. App. 3d 535, 538 (1989). *Carlenn H.* is particularly instructive. In that case, the respondent-appellant argued that her due process rights were violated because the State's petition for adjudication of wardship "did not allege sufficient facts to enable her to prepare a defense." *Id.* at 538-39. This court found, however, that she had waived the issue by failing to object before the trial court. *Id.* at 539. The court pointed out that the issue that had allegedly not been adequately

pleaded "was injected into the proceeding by the parties and actually tried at the hearing." *Id.* Moreover, the court held that the petition's express allegations were sufficient to put the respondent on notice of the cause of action. *Id.* See also *In re John Paul J.*, 343 Ill. App. 3d 865, 878 (2003) ("Only where a pleading wholly and absolutely fails to state any cause of action can an objection be raised for the first time on appeal."). "Therefore, [the court] conclude[d] that any deficiencies of the petition for adjudication of wardship did not violate the due process rights of respondent and that the alleged deficiency [could not] be raised for the first time on appeal." *In re Carlenn H.*, 186 Ill. App. 3d at 539.

¶ 28    In this case, A.H. did not raise any objection to the sufficiency of the allegations before the circuit court. The issue of M.F.Y.'s medication was inserted by the parties—in the form of a stipulation—and contested before the circuit court. Therefore, A.H. waived any objection that the petition was not sufficiently pleaded. Moreover, the allegations in the petition reasonably notified A.H. of the State's cause of action. Treatment of M.F.Y.'s mental illness was a central issue of the petition, and her need for medication clearly fits into the State's allegation that she was neglected. Consequently, the alleged deficiencies in the petition did not violate A.H.'s due process rights.

¶ 29    A.H.'s next argument is that the circuit court's finding of neglect was in error. "It is the burden of the State to prove allegations of neglect by a preponderance of the evidence." *In re Arthur H.*, 212 Ill. 2d 441, 463-64 (2004). Ordinarily, "a trial court's ruling of neglect will not be reversed unless it is against the manifest weight of the evidence." *Id.* at 464. However, where the trial court's findings were "based upon a stipulated record and not based upon any observations of the witnesses or witnesses' testimony" we review the trial court's findings *de novo*. *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 28. Because the circuit court's finding of negligence was based upon stipulated evidence and not live testimony, we employ the *de novo* standard.

¶ 30    A.H. contends that the evidence supported a finding of no-fault dependency rather than a finding of neglect. The Juvenile Court Act defines a dependent minor, in relevant part, as a minor "who is without proper medical or other remedial care recognized under State law or other care necessary for his or her well being through no fault, neglect or lack of concern by his parents". 705 ILCS 405/2-4(1)(c) (West 2020). The Juvenile Court Act defines a *neglected* minor, in relevant part, as a minor "who is not receiving the proper or necessary support *** or medical or other remedial care recognized under State law as necessary for a minor's well-being" (705 ILCS 405/2-3(1)(a) (West 2020)) or "whose environment is injurious to his or her welfare" (705 ILCS 405/2-3(1)(b) (West 2020)). See also *In re Diamond M*., 2011 IL App (1st) 111184, ¶ 19 (contrasting the statutory definitions of neglect and no-fault dependency).

¶ 31    The terms "neglect" and "injurious environment" are "fluid" or "amorphous" concepts. *In re Arthur H.*, 212 Ill. 2d at 463. "Accordingly, cases involving allegations of neglect and adjudication of wardship are *sui generis*, and must be decided on the basis of their unique circumstances." *Id.*

¶ 32    A.H. argues that she was unable to provide M.F.Y. with the care that she needed because she was understandably afraid of M.F.Y. A.H. points to evidence of M.F.Y.'s homicidal ideations, verbal threats, and "violent outbursts." As a result of her justified fear, she argues, A.H. was simply unable to provide M.F.Y. with the kind of care that her condition required. She points out that the evidence shows that she made phone calls to both H.Y. and M.F.Y.'s former crisis therapist, but to no avail. She also points out that she participated in M.F.Y.'s treatment during her March 2020 hospitalization. Under these circumstances, she contends, a finding of dependency would have been more appropriate than a finding of neglect. See, *e.g.*, *In re Christopher S.*, 364 Ill. App. 3d 76, 87 (2006) (affirming a finding of no-fault dependency where the respondents locked out a

10

minor after a "violent altercation" but also attempted to find alternative care for the minor and were willing to participate in his treatment).

¶ 33    The State and GAL argue that the evidence supported the circuit courts finding of neglect. The uncontroverted evidence established that M.F.Y. suffers from bipolar disorder. When not compliant with her medication, M.F.Y. expressed homicidal ideation and experienced auditory hallucinations with commands to perform self-harm. Nevertheless, M.F.Y. was left, on several occasions, without the medication that she needed to treat her bipolar disorder and without a home to return to after being deemed fit for discharge from the hospital. A.H. failed to fill M.F.Y.'s prescription, failed to deliver her medication to M.F.Y. when she was staying with her father, and failed to deliver the mediation to M.F.Y. when she was in the hospital awaiting discharge. On several occasions, A.H. refused to allow M.F.Y. to return home after medical professionals deemed her ready for discharge. The evidence also showed that A.H. attempted to have M.F.Y. arrested rather than medically treated, and she refused to accompany M.F.Y. to the hospital on several occasions. On one occasion, A.H. was warned that a complaint would be lodged with DCFS, but she maintained her refusal to accompany M.F.Y.

¶ 34    Moreover, the evidence established that A.H. is not compliant with the visitation requirements for her other children in DCFS custody. Although the proof of neglect of one minor "does not constitute conclusive proof of the neglect of another minor," such evidence is admissible. *In re Arthur H.*, 212 Ill. 2d at 479. Similarly, M.F.Y.'s out-of-court statements as recorded in the hospital records were admissible, although not necessarily dispositive in and of themselves. See *In re J.L.*, 2016 IL App (1st) 152479, ¶ 87 (citing 705 ILCS 405/2–18(4)(c) (West 2014)). The State and GAL argue persuasively that this evidence all weighs in favor of a finding of neglect.

11

¶ 35    The State and GAL also attempt to distinguish this case from *In re Christopher S*. In that case, the evidence showed that the respondent parents "contacted over 43 different agencies and individuals in an attempt to find alternative care for" the minor. *In re Christopher S.*, 364 Ill. App. 3d at 88-89. Evidence also showed that the respondents had offered to pay for placement, were willing to participate in the minor's treatment, and that DCFS would not have sought a neglect finding had the minor been accepted by an aid agency. *Id.* In contrast, the evidence in this case only reveals three phone calls made by A.H.: one to H.Y., one to M.F.Y.'s former crisis counsellor, and one to the police. A.H. did not call the police to get M.F.Y. medical assistance, but to have her arrested for "acting out." A.H. participated in M.F.Y.'s treatment during her hospitalization in March 2020, but after that date she refused on multiple occasions to accompany M.F.Y. to the hospital and failed to provide M.F.Y. with her medication. See also *In re Diamond M.*, 2011 IL App (1st) 111184, ¶ 27 (distinguishing *In re Christopher S.* because "[t]here is no evidence in the record that respondent made any remotely comparable efforts to find a residence for [the minor], and there is no evidence that suggests respondent was financially unable to provide alternative care for [the minor]."

¶ 36    A.H. argues that the "43 agencies and individuals" of *In re Christopher S.* is an unreasonably high standard for this court to apply. We do not hold that *In re Christopher S.* establishes the benchmark for establishing no-fault dependency; as we noted above, all cases of this sort "are *sui generis*, and must be decided on the basis of their unique circumstances." *In re Arthur H.*, 212 Ill. 2d at 463. Based on our review of the record, we agree with the circuit court that the evidence supports a finding of neglect rather than no-fault dependency.

¶ 37    Finally, A.H. argues that it is "the height of hypocrisy" for the State and GAL to argue that M.F.Y. was neglected by A.H. when the evidence shows that DCFS also struggled to find a suitable

placement for M.F.Y. Indeed, the record includes a motion filed by the GAL requesting "immediate placement consistent with the minor's needs." The motion alleged that, in the autumn of 2020, M.F.Y. had to stay in the hospital for more than two weeks after being deemed fit for discharge because her assigned case manager had been unable to find a suitable placement for her.

¶ 38   The argument is well taken. There certainly are unfortunate cases—such as *In re Christopher S.*—in which a minor is neither ill enough to be hospitalized nor well enough to be placed in a home. Those cases pose a very difficult problem for the entire system. Still, the question before the circuit court—and now before this court—was whether the State proved by a preponderance of the evidence that M.F.Y. was neglected. The State met that burden. That DCHF was apparently unable to serve M.F.Y. as quickly or as well as would be ideal is of no consequence to the task before us.

¶ 39                                    CONCLUSION

¶ 40   A.H. waived any argument that the State's petition for adjudication of wardship did not plead sufficient facts to put her on notice of the State's claims. Even if she had not waived those arguments, the allegations of the petition were sufficient to put A.H. on notice of the cause of action. Finally, the State met its burden to show by a preponderance of the evidence that M.F.Y. was neglected.

¶ 41   Affirmed.