2024 IL App (4th) 240982-U

NOS. 4-24-0982, 4-24-0983, 4-24-0984, 4-24-0985, 4-24-0986 cons.

NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 27, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* E.A., Kl. A., Ja. A., L.A., and Jo. A., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Whiteside County |
| Petitioner-Appellee, | ) | Nos. 17 JA11, |
| v. | ) | 17JA12, |
| Casie A., | ) | 17JA13, |
| Respondent-Appellant). | ) | 17JA14, |
| | ) | 17JA15 |
| | ) | |
| | ) | Honorable |
| | ) | James F. Heuerman, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE CAVANAGH delivered the judgment of the court.
Justices Steigmann and Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) Unless the parties consent, a stipulation from a previous trial does not apply to a new trial.

(2) By finding that respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare, the circuit court did not make a finding that was against the manifest weight of the evidence.

(3) By finding that it would be in the children's best interests to terminate respondent's parental rights, the circuit court did not make a finding that was against the manifest weight of the evidence.

¶ 2    On the State's petition, the circuit court of Whiteside County terminated the

parental rights of respondent, Casie A., to five of her children: E.A. (born September 2007),

Kl. A. (born September 2008), Ja. A. (born September 2009), L.A. (born September 2010), and Jo. A. (born December 2011). Respondent appeals on three grounds.

¶ 3        First, respondent argues the circuit court abused its discretion by denying her motion *in limine*, in which she requested that, at the parental fitness hearing, the court take judicial notice of a report by a clinical psychologist, Dr. Kirk Witherspoon. In our *de novo* interpretation of section 2-18(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-18(6) (West 2022)), we conclude that the report was inadmissible.

¶ 4        Second, respondent argues that by finding she was an "unfit person" within the meaning of section 1(D)(b), (m)(i), and (ii) of the Adoption Act (750 ILCS 50/1(D)(b), (m)(i), (ii) (West 2022)), the circuit court made a finding that was against the manifest weight of the evidence. In our review of the record, however, we find arguable support for the court's finding that respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare. See *id.* § 1(D)(b). Thus, we need not take up the other alleged grounds of parental unfitness.

¶ 5        Third, respondent argues that, by finding it would be in the best interests of the children to terminate her parental rights, the circuit court made a finding that was against the manifest weight of the evidence. Nevertheless, in our review of the record, we find evidence that arguably supports that finding as well.

¶ 6        Therefore, we affirm the circuit court's judgment.

¶ 7                                I. BACKGROUND

¶ 8        A. The Second Amended Petition to Terminate Respondent's Parental Rights

¶ 9        On May 16, 2022, the State filed its second amended petition to terminate respondent's parental rights. (The previous year, the father filed final and irrevocable surrenders

of his parental rights to the five children. After admonishing the father, the circuit court accepted the surrenders.) The second amended petition alleged that respondent was an "unfit person" on three grounds: (1) she had failed to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare; (2) during nine-month periods after the adjudication of neglect—specifically, February 8, 2020, to November 8, 2020, and February 1, 2021, to November 1, 2021—she failed to make reasonable progress toward the return of the children to her custody; and (3) during those same nine-month periods, she failed to make reasonable efforts to correct the conditions that were the bases for removing the children from her custody.

¶ 10                              B. The Initial Termination Proceedings

¶ 11          On September 13, 2022, Judge Senneff held an evidentiary hearing on the second amended petition for the termination of parental rights.

¶ 12          On January 31, 2023, at the conclusion of a further evidentiary hearing on the second amended petition, the parties stipulated to the admission of respondent's exhibit No. 4, Dr. Witherspoon's report of a psychological examination he performed on respondent in October 2017.

¶ 13          On March 31, 2023, Judge Senneff recused herself and assigned the case to Judge Heuerman, who decided to "start from scratch because it [was] just too much evidence that Judge Senneff heard."

¶ 14          On January 16, 2024, before Judge Heuerman, the parental fitness hearing began anew.

¶ 15                              C. Judicial Notice

¶ 16          On January 16, 2024, the first day of the new trial, the State requested that the circuit court take judicial notice of the following court records:

- 3 -

"the stipulation filed on April 17th of 2018 [that the minors were neglected], the orders of adjudication and disposition filed August 17, 2018[,] granting guardianship to DCFS of the minors and ordering parents to cooperate with services, as well as the prior court review and orders in the cases specifically on *** October 15th of 2019, April 28th of 2020, September 22nd of 2020, March 9th of 2021, September 28th of 2021[,] and then lastly, Father's surrenders on September 28th of 2021 as well."

There was no objection. Accordingly, the court granted the State's request to take judicial notice of those court records.

¶ 17                          D. Respondent's Motion *in Limine*

¶ 18          On May 17, 2024, respondent filed a document titled "Motion *in Limine* for Judicial Notice of Dr. Witherspoon's Psychological Evaluation." The motion alleged as follows: On October 16, 2017, Dr. Witherspoon performed a psychological examination of respondent and on October 27, 2017, he wrote a report of his examination. Since then, Dr. Witherspoon had retired, and he was no longer professionally insured. He resisted the idea of appearing as a witness in the parental fitness hearing. He protested that he no longer could "function legally or ethically in the role of a psychologist." Respondent's motion *in limine* argued, however, "The Psychological Evaluation was filed as part of a Court Review and is part of the Court file[,] and the Court should take Judicial Notice of the report as part of the file." The motion requested that the court do so.

¶ 19          On May 21, 2024, which was the third day of the hearing on the second amended petition to terminate parental rights (with Judge Heuerman presiding), the circuit court heard arguments on respondent's motion *in limine*. Respondent's attorney explained that when he

subpoenaed Dr. Witherspoon to testify about his report, Dr. Witherspoon responded by filing a complaint against respondent's attorney with the Attorney Registration and Disciplinary Commission and informing respondent's attorney that he "would not prepare." Though preferring live testimony by Dr. Witherspoon, respondent's attorney thought he "[could] still get the Court to consider a psychological evaluation that ha[d] already been filed with the Court as the Court ha[d] already taken judicial notice of these cases."

¶ 20 The circuit court asked for the State's response to respondent's motion *in limine*. The assistant state's attorney acknowledged that Dr. Witherspoon's report was in the court file. Even so, she was reluctant to agree to respondent's motion, because although a court could take judicial notice of previous court orders, she "[did not] know that a psychological evaluation [was] included in that."

¶ 21 Then, after calling the parties' attention to section 2-18 of the Juvenile Court Act (705 ILCS 405/2-18 (West 2022)), the circuit court asked the guardian *ad litem* what she thought on this question. She responded, "I did not have an objection based on the best interests of the children for it to be entered as it was part of the case plan, it was court ordered previously and therefore, it's part of the court record. I have no objection."

¶ 22 Next, the circuit court asked the attorney for the Illinois Department of Children and Family Services (DCFS) what his position was on this evidentiary question. He answered, "I think if this was entered into evidence at any time[,] then it would be admissible."

¶ 23 The circuit court then called the parties' attention, more specifically, to subsection (6)(b) of section 2-18 (*id.* § 2-18(6)(b)), which provided that even if the evidence was "admitted in prior proceedings involving the same minor," judicial notice might be taken of the evidence

only if "the taking of judicial notice would not result in admitting hearsay evidence at a hearing where it would otherwise be prohibited."

¶ 24 The assistant state's attorney then remarked that subsection (6)(b) "would almost preclude it because you're talking about testimony from a doctor who's not here and that's essentially hearsay."

¶ 25 Respondent's attorney argued, "Well, I guess it would be the Court has taken judicial notice of court review reports which would also contain otherwise inadmissible hearsay, so I don't see how this is any different."

¶ 26 The circuit court responded that the State had requested the court to take judicial notice of a stipulation, court orders, and the father's surrenders but that the State had not requested the court to take judicial notice of any reports. In any event, the court added, respondent's attorney never objected to the State's request.

¶ 27 Nor had anyone made an objection yet to his motion *in limine*, respondent's attorney retorted—prompting the assistant state's attorney to clarify that she did indeed object on the ground of hearsay. The circuit court asked respondent's attorney if he could think of an applicable hearsay exception.

¶ 28 Respondent's attorney quoted section 2-18(4)(f) (*id.* § 2-18(4)(f)):

> " 'Proof of the impairment of emotional health or impairment of mental or emotional condition as a result of the failure of the respondent to exercise a minimum degree of care toward a minor may include competent opinion or expert testimony, and may include proof that such impairment lessened during a period when the minor was in the care, custody or supervision.' "

The circuit court commented, however, "Well, that seems to address the admissibility of a particular type of evidence as opposed to the—I don't—I don't think I read that as an exception to the hearsay rule. It's just—in fact, it refers to opinion or expert testimony."

¶ 29    Unaware, then, of an applicable hearsay exception, the circuit court decided: "[Section 2-18(6)] precludes admission of the—of the report by judicial notice or otherwise. I don't think I can consider it, but as I said before, rulings on the admissibility of evidence are by their very nature without prejudice. I mean, you can always try again depending on how the case goes or frankly, if a hearsay exception springs to mind and you want to argue it again, offer it again. You can offer a refused exhibit as many times as you want to and see what happens each time, I guess. I just—I read the section as being the one that controls the issue. So at this point your motion *in limine* is heard and denied."

¶ 30    E. Evidence in the Parental Fitness Hearing

¶ 31    1. *The Reason Why the Children Were Removed From Respondent's Custody*

¶ 32    The gist of Jill Blair's testimony was this. In 2017, she was the DCFS investigator assigned to the case. The initial report she investigated was (1) "[s]exual abuse by one of the siblings in the home" and (2) "lack of supervision and ongoing sexual abuse between the minors in the home."

¶ 33    Pursuant to a safety plan, an elder brother was removed from the home. Then some of the other minors were interviewed. They "disclos[ed] further sexual abuse going on with [the elder brother]" and "also between themselves beyond [the elder brother]."

¶ 34    "[A]t least some of" the sexual abuse was "going on in [respondent's] care." Several of the minors "disclosed that they knew that they had told their parents about [the elder

brother] and what he was doing to them." This news did not cause much of a reaction from the parents. "Some of the minors said nothing got done," and "some of them said that [the elder brother] got talked to, *** yelled at, [and] spanked."

¶ 35 After the first three interviews, DCFS took protective custody of "all [10 children]" (5 of whom are the subjects of these appeals).

¶ 36 2. *The Assigned Task of Following up With Dr. O'Riordan*

¶ 37 Respondent performed several of the tasks that DCFS had set for her. She completed a parenting course and a domestic violence course. She underwent a substance abuse assessment, which did not reveal any drug problems. In March 2018, she underwent an examination by a clinical psychologist, Dr. Nicholas F. O'Riordan.

¶ 38 Upon receiving Dr. O'Riordan's report of the examination, DCFS wrote into respondent's service plan that respondent should contact Dr. O'Riordan, find out from him what type of psychological treatment might be beneficial to her, and follow his recommendation. Blair testified that, from August 2018 to February 2020, when she was a DCFS placement worker assigned to monitor respondent's progress (having changed positions from an investigator), respondent never called Dr. O'Riordan to obtain his recommendations.

¶ 39 Carrie Konig was the placement worker assigned to the case from May 29, 2020, onward. According to her testimony, Dr. O'Riordan recommended that respondent undergo "[cognitive behavioral therapy] with an emphasis on reality therapy."

¶ 40 In September 2020, when Konig met with respondent, she asked respondent why she had not begun carrying out that recommendation by Dr. O'Riordan. To quote Konig's testimony:

"[S]he told me she was waiting to meet with her lawyer to get a copy through her lawyer to go over the recommendations. So I encouraged her to reach out to Dr. O'Riordan to request the recommendations and provided her contact information for Dr. O'Riordan.

Q. Do you know what happened after that? Did she reach out to him?

A. She did reach out to him in January of 2021."

¶ 41 By Konig's understanding, respondent began cognitive behavioral therapy in August 2021. Konig was asked:

"Q. How was her attendance?

A. So she was fairly good at the beginning with attendance, but by November of 2021 she had stopped attending."

Eventually, she started attending again. Konig testified (on April 23, 2024) that respondent "just resumed individual sessions with her counselor maybe within the last couple weeks" but that her "attendance [had]been sporadic within the last few months." Konig was asked:

"Q. Okay. So the recommendations, again, were made in 2018 and to today's date she has not completed that therapy, correct?

A. Correct."

¶ 42 Konig was asked whether, during the three years she had overseen the case, respondent ever asked for help in finding therapy. Konig answered, "No. When we did discuss it she said she was working on it, contacting a couple people. When she did tell me she was struggling, that's why I encouraged her to reach out to Dr. O'Riordan."

¶ 43 3. *Dr. O'Riordan's Diagnosis and His Clarification*

*to Respondent of What Reality Therapy Was*

¶ 44     In preparing for his interview of respondent, Dr. O'Riordan read the records that DCFS had sent him. He noted that, according to the history that DCFS had provided him, an older brother sexually abused respondent when she was in fourth grade and her father sexually abused her when she was 16.

¶ 45     When Dr. O'Riordan interviewed respondent, in March 2018, she acknowledged "that those events happened"—and yet, Dr. O'Riordan noted, "her general opinion of her family was very favorable." She spoke fondly of her father. Dr. O'Riordan got the impression that it was not a matter of forgiveness so much as that, as far as respondent was concerned, there was nothing to forgive. Apparently, in respondent's view, the sexual abuse to which she had been subjected was "irrelevant." To continue quoting Dr. O'Riordan, respondent "did not seem particularly concerned or upset by her childhood, what other people would have considered trauma." In respondent's view, the sexual abuse of her by her brother and her father "hadn't affected her in any negative way and hadn't affected her relationship with her family."

¶ 46     Not only did respondent not "acknowledge or understand her own trauma," but she "appeared to have a similar lack of concern for the trauma *** that her own children may have endured," even when she witnessed the trauma being inflicted. Once, respondent found her older son "holding down one of his younger sisters and apparently attempting to sexually molest her." When Dr. O'Riordan asked respondent "if she had any understanding of why that might be happening," her response was "[b]asically rather casual": " 'gets me,' " " 'I have no idea,' " or words to that effect. When he asked her "whether she had put any guidelines in place to make sure the children were protected from abuse," she answered that "[s]he had thought about it, but she didn't describe any concrete steps."

¶ 47　　In short, according to Dr. O'Riordan's testimony, respondent "tended to be very calm, bland, [and] not particularly concerned." She "tended to stay at a rather bland, unemotional level, slight variations, slightly bemused at matters or concerns that normally would have people upset." At times, she even "show[ed] inappropriate slight smiles." She theorized that the children had gotten hold of a copy of the novel *Fifty Shades of Grey*. Because of this nonchalant attitude and apparent obliviousness to the gravity of the problem, Dr. O'Riordan was concerned that respondent "would not react very strongly if she found out about any future abuse, if she had care of the children and that she would tend to turn a blind eye to such events or situations that looked risky."

¶ 48　　Dr. O'Riordan was uncertain what to make of respondent's absence of "reaction to her own victimization" and lack of a "sense of urgency" regarding her own children. She had no intellectual deficit. On an IQ test, she scored average and above average in some areas. She displayed no signs of "major schizophrenia, bipolar disorder, [or] depression." Dr. O'Riordan testified:

> "[T]here seems to be just an aspect of her personality that is somewhat deviant from the norm, at least certainly in family matters and sexual matters relating to the family and very much focussed [*sic*] on her own concerns rather than those of the children. So I gave her an unspecified personality disorder with narcissistic and antisocial features."

¶ 49　　When asked whether he had made any recommendations for respondent, Dr. O'Riordan answered:

> "While I was pessimistic that there would be change, I felt that it was reasonable to offer her intensive therapy and basically, I mentioned an approach within

cognitive behavioral, which is called reality therapy, where there would be a stress on recognizing problems, understanding cause and effect and taking concrete steps for change."

Reality therapy, Dr. O'Riordan testified in the fitness hearing, was an approach or emphasis within cognitive behavioral therapy. A psychologist named Glasser had written a book titled "Reality Therapy." In reality therapy, Dr. O'Riordan explained,

"The stress is on having the person deal with the reality of the situation—

Q. Okay.

A. —but it's no different than regular cognitive behavioral where you're looking at behavior, but I think I mentioned that to highlight the fact that [respondent] was not dealing with the full reality of what happened and what she needed to do."

¶ 50　　　Dr. O'Riordan recalled that, about a year or two years after his examination of respondent, she telephoned him. She told him "she couldn't find a reality therapist." Dr. O'Riordan "explained, just like [he] did here, that, no, just find a general therapist who does what most of them do, cognitive behavioral therapy[,] and they would understand [his] recommendation that that would mean to put an extra stress on dealing with reality."

¶ 51　　　In his testimony, Dr. O'Riordan was pessimistic about respondent's "ability *** to make *** the necessary progress in therapy." The reason for his pessimism was this: "[U]nlike most people in her situation, [respondent] did not have a sense of urgency or upset or concern and had this kind of bland affect, so [he] was concerned that she would ever make the effort to make the changes."

¶ 52　　　　　　　　　　　　　　　　4. *Visitation*

¶ 53                                    a. Chaos in the Visitations

¶ 54            Blair testified that, initially, visitation was two hours every week and that six children, sometimes fewer, were at the visitations—which respondent attended consistently. Six adults were also at the visitations: respondent, four staff members, and Destani A., an elder sister of the children, who, during the pendency of these cases, turned 18.

¶ 55            The location of the visitations, Blair recounted, had to be changed to the DCFS office because the children were so chaotic in public settings that the staff was asked to take the children away. Respondent was not able to control her children. Blair suggested to her that she write down rules for the children to follow at visitations. Respondent wrote down some rules, but the rules were not consistently followed.

¶ 56            Destani, Blair noticed, was "one of the kids' primary caretakers that they went to during the visitation." Respondent did not seem to have any problem with Destani's functioning as this authority figure. When Destani turned 18, Blair limited her ability to attend visitations, for it was important that respondent "show that she could take care of the children without any extra help."

¶ 57            It was not that respondent was entirely permissive. She sometimes redirected the children or controlled their behavior. However, "[s]ometimes that came from staff members that were there advising the children that they needed to listen to their mom, follow the directions of their mom[,] and they were redirected a lot by staff members that were present more so than their mother."

¶ 58            According to Blair, respondent engaged with the children only "minimally." Jeannette Stender, who supervised the placement workers in the Sterling field office, had received reports that respondent tended to become distracted. Stender testified, "[T]here were

many occasions where [respondent] was on her phone, [respondent] was focussed [*sic*] on the two older children, having conversations with them on a regular basis and not always tending to the other children."

¶ 59        The six children, together, were a handful. According to Blair, however, there was a reason for having visitations *en masse*. The goal was to return not just some of the children, but all of them, home to respondent. The attainment of that goal depended on respondent's demonstrating an ability to supervise the children—*en masse*—without help from anyone. Since she was separated from the children's father, respondent would be the only parent in the house. Having never demonstrated an ability to control the children, respondent never progressed to unsupervised visits. Because she "couldn't provide the structure and the consistency during the two hours that we gave her," Blair reduced the duration of visitations to an hour and a half—and eventually, at the request of most of the children, visitations with respondent ended altogether.

¶ 60        Blair testified that she had "safety concerns for [the children] in regards to [respondent's] supervision" because "these kids were sexually abused in their parents' home multiple times, not just once *** and they said their parents knew about it."

¶ 61                         b. Declined Visitations

¶ 62        April Queckhoerner testified substantially as follows: From February 29, 2020, to May 29, 2020, she was the DCFS caseworker for the minors. Shortly after she took over as their caseworker, the COVID-19 pandemic struck. For about two weeks, there were no visits, not even by phone or video. After those two weeks, however, visits by Zoom or phone were offered. On March 26 or 27, 2020, Queckhoerner left a message for respondent "so that we could discuss services and visits and how we were changing those." Respondent "never responded."

¶ 63        Queckhoerner was asked:

"Q. So she did not take that option to have any video visits with the children?

A. Correct.

Q. To your knowledge did she ever have any video visits during the Covid pandemic?

A. Not during the time that I was supervising the case.

Q. And that, again, was from February 29th of 2020 to May 29th of 2020?

A. Yes."

¶ 64                                    5. *Inquires About the Children*

¶ 65        Konig testified on April 23, 2024, that, every three months, DCFS held a child and family team meeting, at which "[e]veryone [got] together": the children who were old enough to attend, the foster parents, the agencies, and the parents. In the meeting, the children were discussed, and any obstacles to the accomplishment of the services were addressed. Respondent was invited to child and family team meetings, but according to Konig's testimony, respondent "didn't start attending until recently, I want to say maybe within the last year and a half."

¶ 66        Konig was asked:

"Q. Did [respondent] reach out to you while you were caseworker to ever ask how the minors were doing?

A. No."

¶ 67        When E.A. was hospitalized, Konig informed respondent, who "didn't have any follow-up questions," other than to ask if E.A. "was okay." Respondent "didn't ask to speak with [the child] or anything like that."

¶ 68      To take another instance, when there was an allegation that L.A. had been abused, Konig likewise informed respondent. Konig was asked:

"Q. What was her response?

A. That she wasn't surprised and to keep her updated when it was indicated.

Q. Did she ask you how [L.A.] was doing?

A. She did not."

¶ 69                    6. *Respondent's Account*

¶ 70      Respondent testified that she "guess[ed]" she was undergoing "a type of form of [reality therapy] now." She continued:

"A. Nobody knew what that was. Nobody knew what reality therapy was.

Q. Okay. So what was the other therapy that you did?

A. The CBT something.

Q. Okay. When did you start doing that?

A. A couple years ago, within the last two years. Still doing it.

Q. Are you still engaged in that therapy?

A. Uh-huh.

Q. Who are you doing that with?

A. Jessica and her last name starts with an F."

¶ 71      Respondent testified that she had to get herself into cognitive behavioral therapy. She did so "probably right around the end of '22." Without offering any referral, DCFS had told her she needed to get into the therapy.

¶ 72      On cross-examination, respondent was asked:

"Q. You started [cognitive behavioral therapy] in August of 2021, not 2020; isn't that right?

A. I thought it was '22, but '21, yes.

Q. And you stopped doing that treatment again in November of 2021, correct?

A. Yep.

Q. And that was, again, because of sporadic attendance; isn't that correct?

A. Correct.

Q. So you still have not completed that [cognitive behavioral therapy] because of sporadic attendance, correct?

A. That, and because we were waiting to get the updated service plan from Carrie.

Q. So it's Carrie's fault that you haven't completed that treatment?

A. No."

¶ 73       Respondent explained that the reason why, during the reporting period of February 8, 2020, to November 8, 2020, she did not undergo "the reality therapy or [cognitive behavioral therapy]" was that "nobody understood what reality therapy was supposed to be." She was asked:

"Q. Okay. So from 2018 to 2021 did you ever contact Dr. O'Riordan for clarification about what it was?

A. In 2021."

¶ 74              F. The "Order After Hearing on Parental Fitness"

¶ 75        On June 7, 2023, the circuit court entered an order titled "Order After Hearing on Parental Fitness." Among the findings the court made in this order was that respondent had failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare. The court agreed with Dr. O'Riordan that respondent had "demonstrated a 'pervasive lack of urgency' in addressing the issues which brought her children into care."

¶ 76        First, the circuit court noted, "even after approximately seven years in care, at the time of hearing, [respondent] had still failed to complete the treatment recommended by Dr. O'Riordan." In fact, the court added, she "did not even begin the recommended treatment for over two years after it was recommended." The court added:

> "Although there was some confusion regarding the specific nature of the treatment being recommended, that was an issue easily clarified by the person making the recommendation. One who is demonstrating a reasonable degree of interest or concern could easily have obtained the answers needed by asking the author of the recommendation, or seeking the assistance of her caseworker in reaching out to the evaluator. Some delay is understandable, but a delay of years simply is not."

¶ 77        Second, from March 2020 to July 2020, when COVID-19 restrictions were in place, respondent "declined to participate at all" in visitations by phone or Zoom.

¶ 78        Third, respondent made no reasonable efforts "to maintain order between the several children during visits." The circuit court sympathized with the difficulty of "trying to maintain any semblance of order when visiting numerous children of varying ages at once." Even so, according to the court, "[i]t is not enough to just point to the obvious challenges of

trying to parent so many children at once when one has not even made reasonable efforts to improve in her own ability to do so."

¶ 79    Fourth, "[c]redible testimony was presented that [respondent] does not call the caseworker to check on [the children's] welfare or maintain consistent contact to receive updates."

¶ 80                    G. The Hearing on the Children's Best Interests

¶ 81    On June 11, 2024, having found, by clear and convincing evidence, that respondent was an "unfit person," the circuit court held a hearing on the children's best interests.

¶ 82    Konig, who was a placement worker for DCFS from May 2020 to March 2024 (before becoming an investigator), testified to how E.A., Kl. A., L.A., and Jo. A. were doing in their foster homes. (The fifth child, Ja. A.—because of his location—was monitored by a contract agency of DCFS, Camelot Care Centers.) Konig visited the foster homes of those four children once a month.

¶ 83                                1. *Kl. A.*

¶ 84    Kl. A. lived with Jill, who was her fictive kin in Rock Falls. The family composition in the house was Kl. A. and Jill. On the same property where Kl. A. and Jill lived, Jill's sister had her house. Kl. A.'s sister, S.A., lived with Jill's sister. (S.A. is not one of the five minors who are the subjects of the appeals before us.).

¶ 85    Jill worked outside the home and provided for all of Kl. A.'s physical needs: food, shelter, medical care, and clothing. Kl. A. had her own bedroom.

¶ 86    According to Konig's testimony, Kl. A. was "very close with Jill," calling her "[M]om," whereas Kl. A. referred to respondent as "Casie." Not only was Kl. A. "involved with *** Jill's family," but she had "ongoing visits with her siblings" and a "lot of phone

communication [with them] as well." She was "very close" to S.A., fighting with her and getting along with her "just like sisters." Kl. A. had no contact, however, with her "adult family, biological family." She wanted to be adopted by Jill, and Jill wanted to adopt her. DCFS approved of the proposed adoption. "Very rarely" had respondent "reached out to [Konig] inquiring about [Kl. A.]," and Kl. A. had no desire to visit respondent.

¶ 87        Kl. A. was "well-established in her school" and had "been in *** multiple sports." She and Jill had gone on family trips together. They also did household chores together. Jill was teaching her how to cook.

¶ 88                                 2. *L.A. and Jo. A.*

¶ 89        L.A. and Jo. A. lived together in the same home in Bloomington, with fictive kin, Bianca. The family composition was L.A.; Jo. A.; Bianca; her boyfriend, Wade Clark; and the couple's son. Jo. A. had been in this home since 2018, and L.A. since 2019.

¶ 90        Bianca and Wade worked outside the home and arranged for day care. They provided the minors with food, shelter, medical care, and clothing. L.A. and Jo. A. each had their own bedrooms.

¶ 91        They were "very attached to Bianca," calling her "[M]om," and had become part of her extended family. The last time Konig visited, she heard Jo. A. refer to Wade as "[D]ad." L.A. was "comfortable with confiding in Bianca quite a bit." L.A. and Jo. A. wanted to be adopted by Bianca, and Bianca wanted to adopt them. DCFS approved of the proposed adoption of L.A. and Jo. A. by Bianca.

¶ 92        Bianca was "very good at establishing boundaries and appropriate consequences." For instance, when Jo. A. broke his phone, he was not immediately given a new one. Instead, he had to "earn the money for it, so to speak, with chores and such."

¶ 93    Jo. A. was "really involved with student council" and "with band." L.A. was "really into dance."

¶ 94    Although they had "regular sibling contact," they had no contact with the adult family. Konig had contacted respondent when "certain issues [came] up" regarding L.A. and Jo. A., and respondent had "followed up after that, but [she had] not initiated." The last time that respondent saw L.A. and Jo. A. was in August 2021, and there had been no visits with them since then. L.A. and Jo. A. had no desire to see respondent, who had not "called about reestablishing those visits."

¶ 95    3. *E.A.*

¶ 96    Since 2017, E.A. had lived with fictive kin in Rock Falls, Denise and Dennis B. The family composition was Denise and Dennis, E.A., and Denise and Dennis's "two grandsons placed with them" (we continue to quote Konig). Dennis worked outside the home. Denise used to do so before she retired in 2023, at the end of the school year.

¶ 97    When asked how E.A. "related to [her] foster parents," Konig answered, "She's close with them. She definitely pushes her boundaries, but she is—she's happy there." Konig testified that "[t]he last time that I had contact with them they were doing family counseling once a month, so I'm not sure if that's continuing, but the individual counseling certainly continues for [E.A.]" The individual counseling for E.A. was "due to her trauma."

¶ 98    E.A. called Denise and Dennis "[M]om" and "[D]ad" and wanted to be adopted by them. They wanted to adopt her. DCFS approved.

¶ 99    The foster parents provided E.A. with food, shelter, medical care, and clothing—Konig had "no concerns" in that regard. E.A. had her own bedroom.

¶ 100        She was "involved with sports, church, cheerleading"; went to friends' houses; and had friends come over. She visited her siblings—especially Kl. A. and S.A., since they were "local"—but she had not visited respondent since August 2021. "They went down on a trip when [L.A.] had a dance performance recital[,] and they took a trip down to Bloomington for that."

¶ 101                                        4. *Ja. A.*

¶ 102        Stephany Creviston, a caseworker with Camelot Care Centers, testified substantially as follows regarding Ja. A. She saw Ja. A. in the foster home every six months, and "an Iowa [Interstate Compact on the Placement of Children] worker [saw] him once a month" and kept her updated. Since 2017, Ja. A. had lived in Iowa City with Amy G.

¶ 103        He had his own bedroom. Creviston had no concerns about Ja. A.'s material needs. They were all provided for.

¶ 104        The family composition was Ja. A., Amy G., her adopted adult daughter, and her adopted teenage son. Amy worked at a school, which was within walking distance. Consequently, she and Ja. A. "[were] at school at the same time[,] and so they [got] home about the same time."

¶ 105        Creviston was asked:

"Q. And how does [Ja. A.] relate to his foster parent, Amy?

A. He is very attached to Amy. A lot of the times, you know, when he's at school and if he's having a hard day he'll call Amy and she's usually able to deescalate him or kind of calm him down so he can go back to learning, but he really loves Amy.

Q. You kind of mentioned deescalate him. Does [Ja. A.] have some behavioral issues?

A. Yes."

The behavioral issues, Creviston explained, were "extreme aggression." Ja. A. had thrown chairs and tables at school. He had "gone after foster brother and foster sister with screwdrivers, forks when [he was] extremely agitated." He had "broken many things in the home."

¶ 106　　　Creviston was asked:

"Q. The uniqueness of every family and child, what can you say about that in regards to Amy and [Ja. A.]?

A. Due to [Ja. A.'s] extreme behavioral needs, Amy is educated in this field, she has multiple master's degrees and a doctorate, so she—in the field of counseling, like psychology, things like that, so she is very well equipped to handle [Ja. A.'s] behaviors. She knows de-escalation techniques and she's worked as a special education teacher for several years, so she sees those behaviors on the day-to-day and so she knows what calms [Ja. A.] and things like that and also what services are available and what might possibly help him.

Q. So she works as a special education teacher?

A. Yes.

Q. And you're indicating that her background is basically specially trained to—equipped for the behavioral issues that [Ja. A.] has?

A. Yes.

Q. Do you think that plays into how well bonded they are?

A. I think so. I think [Ja. A.] definitely feels understood by her.

Q. Is that part of the reason they moved to Iowa?

A. Yeah, so there was more—there was less of a wait for services in Iowa than there was in Illinois, so he was able to get into these services that he so desperately needed a bit quicker than if he were to stay here.

Q. And Amy decided to move to Iowa so that she could get [Ja. A.] those services?

A. Yes.

Q. So she, essentially, uprooted her life for the best interests of [Ja. A.]?

A. Yes."

¶ 107 Although Ja. A. "struggle[d] with making relationships with others outside of the home" and did not "have many school friends," he had made friends among his group therapy participants. He went for bike rides around the neighborhood and seemed comfortable in the neighborhood.

¶ 108 Amy made sure that if Ja. A. wanted to participate in an activity—"a sport or a club or something like that or just an activity of any kind"—he could do so. Ja. A. chose not to attend most of the sibling visits. Sometimes he was willing to do so, but usually he declined. "He feels a lot of shame of what happened, so he struggles with going to sibling visits."

¶ 109 Creviston was asked:

"Q. [D]oes foster mom have a relationship with his biological mom, [respondent]?

A. Yes.

Q. What about any other adult family?

A. His grandma and any time they're—he gets invited to family functions, a birthday party, Christmas parties, things like that, so he'll see family members then.

Q. So is that when he mostly sees [respondent] is at holidays and social events?

A. Yes."

¶ 110 According to Creviston's testimony, Ja. A. was "very much a part of [Amy's] family", and they "plan things around him, *** include him on any outings that they might do or any trips that they do." He referred to the other adopted family members in the home as his sister or his brother. He seemed to regard the foster family as his "nuclear family," in which, despite his behavioral problems, he experienced "[c]ontinuity of affection."

¶ 111 For the past year, Ja. A. had told Creviston he wanted to be adopted by Amy. Creviston was asked:

"Q. Has he, in fact, had a conversation with [respondent] about that?

A. As far as I know that's what he reported to me is that he did."

Ja. A. referred to Amy as "[M]om." She was willing to provide for his needs and take care of him until he was an adult. DCFS approved of the proposed adoption.

¶ 112 When asked whether she had any concerns if Ja. A. was "not *** placed there and was to return back home," Creviston answered:

"I believe that those behaviors would escalate as it would take him a very long time to get into services here that have benefitted him so much and he's been established in services in Iowa, so I think it would be a major change for him that would cause these behaviors to very much so escalate."

¶ 113    The State's next witness, Jaclyn Rogers, testified she was employed by DCFS as a placement supervisor and that she was the supervisor of the caseworker for the children, Grace Arneson. Because Arneson was too ill to attend the hearing, Rogers was testifying in her stead. Rogers testified to having "a conversation with [Arneson] about a conversation that she had with [E.A. and Kl. A.]," at a home visit in May 2024, "about their desire to be adopted." (Here, the circuit court overruled respondent's double hearsay objection—since hearsay was admissible in a hearing on the children's best interests—but the court acknowledged that, because of the double hearsay, the weight that Rogers's testimony deserved could reasonably be disputed. Nevertheless, the court thought "the information could still be helpful.") E.A. and Kl. A. had told Arneson (Rogers testified) that they were "comfortable and happy" in their foster homes and that they wanted to stay in their foster homes.

¶ 114    Having no more witnesses, the State then requested that the circuit court take judicial notice of the evidence adduced in the parental fitness hearing. Without objection by any of the other attorneys, the court did so, whereupon the State rested.

¶ 115    Respondent's attorney then called respondent's elder daughter, Destani A., who testified as follows: She was taken into protective custody in 2017, before she turned 18. Her foster parents did not encourage her to visit or contact respondent. In fact, Destani heard one of the foster parents advise E.A., who also was placed with them, that she ought to forget about visiting respondent and should, instead, "move on with her life."

¶ 116    Next, respondent's attorney called, Daulten A., who likewise was taken into protective custody before he turned 18. He testified that respondent loved him and his siblings and that she regularly visited him and kept in contact with him.

¶ 117    At the conclusion of the hearing on the children's best interests, the circuit court found, by a preponderance of the evidence, that it would be in the children's best interests to terminate respondent's parental rights. Accordingly, the court did so.

¶ 118    These appeals followed.

¶ 119                    II. ANALYSIS

¶ 120           A. The Denial of Respondent's Motion *in Limine*

¶ 121    Respondent contends that, by denying her motion *in limine*, the circuit court abused its discretion. It is true that, generally, the circuit court's ruling on a motion *in limine* is reviewed for an abuse of discretion. See *Passafiume v. Jurak*, 2024 IL 129761, ¶ 18. "However, where the motion *in limine* raises a question of law, a reviewing court applies a *de novo* standard of review." *Id.* Respondent maintains that section 2-18(6) of the Juvenile Court Act (705 ILCS 405/2-18(6) (West 2022)) required the admission of Dr. Witherspoon's report in the evidentiary hearing over which Judge Heuerman presided. What a statute means and how it should be applied are questions of law, which we decide *de novo*. See *Goldfine v. Barack, Ferrazzano, Kirschbaum & Perlman*, 2014 IL 116362, ¶ 48; *1940 LLC v. County of McHenry*, 2012 IL App (2d) 110753, ¶ 6. Therefore, we will decide *de novo* whether Dr. Witherspoon's report was admissible under section 2-18(6). See *Goldfine*, 2014 IL 116362, ¶ 48; *1940 LLC*, 2012 IL App (2d) 110753, ¶ 6.

¶ 122    That statute reads as follows:

    "(6) In any hearing under this Act, the court may take judicial notice of prior sworn testimony or evidence admitted in prior proceedings involving the same minor if (a) the parties were either represented by counsel at such prior proceedings or the right to counsel was knowingly waived and (b) the taking of

- 27 -

judicial notice would not result in admitting hearsay evidence at a hearing where it would otherwise be prohibited." 705 ILCS 405/2-18(6) (West 2022). Respondent reasons along these lines. Dr. Witherspoon's report was "evidence admitted in prior proceedings involving the same minor." *Id.* § 2-18(6). In those prior proceedings, the parties were "represented by counsel." *Id.* § 2-18(6)(a). Even if Dr. Witherspoon's report was "hearsay evidence," its admission at the hearing over which Judge Heuerman presided would not be "prohibited," for at a prior hearing, over which Judge Senneff presided, the parties stipulated to the admission of this report in evidence as respondent's exhibit No. 4. "[T]he law is clear that hearsay admitted without objection can be given its natural probative weight." *In re M.D.*, 2022 IL App (4th) 210288, ¶ 102. Obviously, by stipulating to the admission of Dr. Witherspoon's report, the assistant state's attorney and the guardian *ad litem* refrained from objecting to it. They effectively agreed that any hearsay therein, which otherwise might have been inadmissible, should be given its "natural probative weight." *Id.* Or so the reasoning goes.

¶ 123        The weak spot in that reasoning is the assumption that the stipulation at the hearing before Judge Senneff carried over to the hearing before Judge Heuerman. That assumption would be sound if Judge Heuerman's hearing were a continuation of Judge Senneff's hearing. As Judge Heuerman made clear, however, he did not intend to preside over a continuation. He announced, rather, that he was "start[ing] from scratch." That idiomatic phrase "start from scratch" means "to begin from a point at which nothing has been done yet." Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/start%20from%20scratch. Judge Heuerman held a new trial on the second amended petition for the termination of parental rights. Witnesses who were called

previously, in the hearings before Judge Senneff, were called again, to testify anew. The evidentiary slate was wiped clean, to be written upon all over again.

¶ 124    The supreme court has held, "Except by consent of the parties, stipulations on a former trial are not admissible upon a subsequent hearing." *People ex rel. Borelli v. Sain*, 16 Ill. 2d 321, 327 (1959). In *Borelli*, the case in which the supreme court stated that holding, the Cook County sheriff arrested Frank Borelli upon an extradition warrant that the governor of Illinois had issued at the request of the governor of New Jersey. *Id.* at 323. Borelli filed a petition for a writ of *habeas corpus*, in which he claimed that he was not in New Jersey at the time of the charged offenses. *Id.* The circuit court issued a writ of *habeas corpus* and held a hearing. *Id.* At the hearing, the respondents—the Cook County sheriff and a messenger from New Jersey— "stipulated [Borelli] would deny his presence in New Jersey if called upon to testify." *Id.* The respondents, however, called John E. Jackson—unnecessarily, the supreme court noted—and Jackson testified that Borelli was indeed in New Jersey when the crimes were committed. *Id.* at 323-24. The circuit court quashed the writ of *habeas corpus*, and Borelli appealed. *Id.* at 324. Because the circuit court had unduly restricted Borelli's cross-examination of Jackson, the supreme court reversed the circuit court's judgment—without any determination on the merits— and remanded the case for a new hearing. *Id.*

¶ 125    On remand, at the new hearing, the respondents "refused to stipulate to [Borelli's] testimony, or to consent to the introduction of the former stipulation, and were permitted to establish a *prima facie* case solely by the introduction of the Governor's warrant into evidence." *Id.* at 324. At this new hearing (as at the former hearing), Borelli did not testify. *Id.* Instead, he called Jackson and impeached him, but Jackson stuck to his story that Borelli was in New Jersey

when the crimes were committed. *Id.* The circuit court again quashed the writ of *habeas corpus*, and Borelli again appealed. *Id.* at 325.

¶ 126 In Borelli's second appeal, the supreme court observed:

"[I]t is manifest that the introduction of the Governor's warrant was, even without the supporting testimony of Jackson, sufficient to make a *prima facie* case which placed upon [Borelli] the burden of proving he was not a fugitive from justice or, more specifically, that he was not in New Jersey at the time of the crimes as his petition alleged. It is equally manifest that [Borelli] completely failed to meet his burden." *Id.*

Borelli completely failed to carry his burden of proof because, at the second trial, he presented no evidence.

¶ 127 Why, at the second trial, did Borelli make no attempt to prove he was absent from New Jersey during the period in question? The reason was that, by his understanding, "the new hearing" was "but a continuation of the first trial." *Id.* at 326. Accordingly, he "argue[d] that the stipulation in the record of the first hearing [had to] be considered as evidence refuting the *prima facie* case in the new hearing since there was no 'motion or other proceeding to vacate the stipulation.' " *Id.* at 326-27.

¶ 128 As the supreme court pointed out, Borelli labored under a legal error. See *id.* at 327. When (as in his first appeal) a "court of review [did] not determine the merits of a case but merely reverse[d] and remand[ed] without specific directions, the judgment of the court below [was] entirely abrogated[,] and the case [stood] as if no trial [had] occurred." *Id.* at 326. "Except by consent of the parties, stipulations on a former trial [were] not admissible upon a subsequent hearing." *Id.* at 327. The respondents had "expressly refused their consent to the admission of the

stipulation at the second hearing." *Id.* Despite that refusal, Borelli "offered no proof to support his claim that he had not been in New Jersey at the time of the alleged crimes." *Id.* Instead, he "relied solely upon an effort to destroy the credibility of Jackson." *Id.* Because there was no evidence on Borelli's side of the ledger, the supreme court, in the second appeal, affirmed the quashing of the writ of *habeas corpus*. See *id.* at 328.

¶ 129    The present case is different from *Borelli* in that no court of review has reversed the circuit court's judgment and remanded the case. Even so, when Judge Heuerman took the place of Judge Senneff and resolved to start from scratch, "the case [stood] as if no trial [had] occurred"—just as if there had been a reversal and a remand without a determination on the merits. *Id.* at 326. Judge Heuerman held a new trial. "Except by consent of the parties, stipulations on a former trial are not admissible upon a subsequent hearing." *Id.* at 327. At the second trial, the State was unwilling to consent to the admission (or judicial notice) of Dr. Witherspoon's report, and the stipulation in the former trial was inadmissible. See *id.* There was no *continuing* agreement to admit hearsay. It follows that "taking *** judicial notice" of Dr. Witherspoon's report "would [have] result[ed] in admitting hearsay evidence at a hearing where it would otherwise [have been] prohibited." 705 ILCS 405/2-18(6) (West 2022). Under section 2-18(6), then, the circuit court was right to deny respondent's motion *in limine*.

¶ 130                    B. Maintaining a Reasonable Degree of Interest,

                    Concern, or Responsibility as to the Minors' Welfare

¶ 131    To terminate parental rights, the circuit court must make two separate and distinct findings: (1) the biological parents of the child validly executed a voluntary surrender of their parental rights and a consent to adoption, or, alternatively, it has been proven, by clear and convincing evidence, that the parents are "unfit persons" within the meaning of section 1(D) of

the Adoption Act (750 ILCS 50/1(D) (West 2022)) and (2) it has been proven, by a preponderance of the evidence, that it would be in the best interests of the child to terminate parental rights and to appoint a guardian and authorize that guardian to consent to an adoption of the child. 705 ILCS 405/2-29(2) (West 2022); *In re D.T.*, 212 Ill. 2d 347, 366 (2004); *In re M.M.*, 226 Ill. App. 3d 202, 209 (1992).

¶ 132        In the present cases, the father surrendered his parental rights to E.A., Kl. A., Ja. A., L.A., and Jo. A. Respondent, however, has not done so. Therefore, the first prerequisite to the termination of her parental rights to the five minors was a finding, by clear and convincing evidence, that she was an "unfit person" within the meaning of any section of the Adoption Act that the State cited in its second amended petition for the termination of parental rights (see 750 ILCS 50/1(D)(b), (m)(i), (ii) (West 2022)).

¶ 133        The circuit court found it had been proven, by clear and convincing evidence, that respondent conformed to all three of the cited definitions of an "unfit person." That is, she had "[f]ail[ed] to maintain a reasonable degree of interest, concern or responsibility as to the children's welfare" (*id.* § 1(D)(b)); she had "[f]ail[ed] *** to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication of [neglect]," specifically, during the periods of February 8, 2020, to November 8, 2020, and February 1, 2021, to November 1, 2021 (*id.* § 1(D)(m)(i)); and she had "[f]ail[ed] *** to make reasonable progress toward the return of the child to [herself] during any 9-month period following the adjudication of [neglect]," namely, those same periods (*id.* § 1(D)(m)(ii)).

¶ 134        If respondent met only one of those statutory definitions, she was an "unfit person." See *In re F.P.*, 2014 IL App (4th) 140360, ¶ 83. It is not our place to decide whether she

is an "unfit person." Instead, we are limited to deciding whether the circuit court made a finding that was against the manifest weight of the evidence when it found that respondent was an "unfit person" within the meaning of sections 1(D)(b), (m)(i), or (m)(ii)—the sections the State cited in the second amended petition. See *In re C.N.*, 196 Ill. 2d 181, 208 (2001). A finding is against the manifest weight of the evidence only if it is "clearly evident," from the evidence in the record, that respondent's conformance to the statutory definition in question was unproven. *Id.* If reasonable minds could disagree whether a given statutory definition was proven by clear and convincing evidence, we will uphold the circuit court's finding. See *Kaloo v. Zoning Board of Appeals*, 274 Ill. App. 3d 927, 934 (1995).

¶ 135　　　　With that deferential standard of review in mind (see *In re Diamond M.*, 2011 IL App (1st) 111184, ¶ 31), we will compare the evidence at the parental fitness hearing to one of the three cited statutory definitions: the definition in section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2022)).

¶ 136　　　　Section 1(D)(b) provides that a person may be declared "unfit to have a child" on the ground of a "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." *Id.* In deciding whether that definition of an " '[u]nfit person' " has been proven by clear and convincing evidence, the circuit court "must focus on the reasonableness of the parent's efforts to show interest, concern, or responsibility and not necessarily on the success of those efforts." *In re M.J.*, 314 Ill. App. 3d 649, 656 (2000). Reasonableness entails a consideration of "any circumstances that would have made it difficult for the respondent to show interest, concern, or responsibility for the well-being of the child." *Id.* While a parent's interest, concern, or responsibility need not be more than reasonable, reasonableness sets an objective standard to be achieved. Showing some interest in the child or some affection for the child does

not necessarily meet that standard. See *id.* at 657. Rather, the degree of interest, concern, or responsibility must be "objectively reasonable." *Id.*

¶ 137 "[T]he failure to comply with the directives of a service plan with the stated goal of returning a child home is tantamount to objectively unreasonable interest, concern, or responsibility as to the child's welfare." *Id.* As the appellate court put it in *M.J.*:

> "[T]he supreme court has recently implied that a parent's failure to comply with the directives of a service plan, *i.e.*, failure to make reasonable efforts or reasonable progress toward the return of the children, is analogous to a parent's failure to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the children. [Citation.] The only difference is that in determining reasonable efforts or reasonable progress the trial court must limit its findings to a specific time frame, whereas in determining the degree of interest, concern, or responsibility as to the welfare of the children no such time frame exists." *Id.* at 656.

¶ 138 Respondent contends that, from the beginning of this case, she has shown a reasonable degree of interest, concern, or responsibility as to the children's welfare. She argues, "Unrefuted testimony was provided to show that [respondent] *participated in* all recommended services, except family therapy, which was not yet deemed appropriate." (Emphasis added.)

¶ 139 But why was family therapy "not yet deemed appropriate?" According to Konig's testimony before Judge Heuerman on April 23, 2024, it was because respondent "wasn't participating in her own individual mental health counseling." There had to be progress in individual counseling before family counseling was begun. At Sinnissippi Centers, respondent was "given recommendations" "[f]or mental health." Konig continued:

"[Respondent] did participate for awhile and then she would stop, go back in, have another assessment done. That happened at least twice. It might have been three times. She did not complete the services there for her mental health.

Q. And was that closed out because she wasn't participating?

A. Yeah. So if you don't participate at Sinnissippi for 30 days, then they close your case out."

Arguably, participating in a service now and then during the life of a case does not necessarily qualify as the *maintenance* of a *reasonable* degree of interest, concern, or responsibility as to the minors' welfare. See 750 ILCS 50/1(D)(b) (West 2022). On-and-off again participation in services need not be regarded as meeting the standard of reasonableness.

¶ 140    The circuit court acknowledged a "circumstance[ ] that would have made it difficult" for respondent to avail herself of the service that Dr. O'Riordan had recommended: the uncertainty as to what "reality therapy" was. *M.J.*, 314 Ill. App. 3d at 656. However, the court had a point when commenting, essentially, that only so much mileage could be gotten out of that excuse. All respondent had to do was pick up the phone and ask Dr. O'Riordan what "reality therapy" was and what kind of therapists provided it (and then do a Google search: "cognitive behavioral therapists near me"). Blair testified that, from August 2018 to February 2020, respondent never called Dr. O'Riordan to obtain clarification on the kind of psychological treatment she should undergo, even though it was written into her service plan that she should contact him. In January 2021, respondent finally telephoned Dr. O'Riordan and learned that virtually any cognitive behavioral therapist could provide reality therapy. But then it was not until August 2021 that respondent began cognitive behavioral therapy—only to be discharged from the therapy program on the ground of "sporadic attendance."

¶ 141        This is not to ignore respondent's completion of other services. She completed a parenting course, a domestic violence course, a substance abuse assessment, and a psychological evaluation. She consistently attended in-person supervised visitations. Despite her good attendance, however, she arguably maintained, in these visitations, a less than reasonable degree of responsibility as to the children's welfare in that she made an insufficient effort to control them—being preoccupied, instead, with her phone or with her conversations with the older siblings. Since she had a phone, there appeared to be no good reason why she declined months of phone visitation during the COVID-19 pandemic.

¶ 142        Arguably, then, the State proved, by clear and convincing evidence, that respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare. See 750 ILCS 50/1(D)(b) (West 2022). The circuit court's finding that the State carried this burden of proof is not against the manifest weight of the evidence. We understand how the court could perceive in respondent a " 'pervasive lack of urgency' " regarding her imperiled parental rights. That perception is not arbitrary or devoid of evidentiary support.

¶ 143                    C. The Best Interests of the Children

¶ 144        Respondent maintains that, by finding it would be in the best interests of the five children to terminate her parental rights, the circuit court made a finding that was against the manifest weight of the evidence. See *In re C.P.*, 2019 IL App (4th) 190420, ¶ 68 ("A reviewing court will not disturb the trial court's decision regarding a child's best interests and the termination of parental rights unless it is against the manifest weight of the evidence."). In support of that position, she argues:

"[Respondent] is not a perfect mother and does not pretend that she is. However, she is still these children's mother and was their primary maternal figure up until the children were taken from her in 2017. She loves these children and is willing to do whatever is necessary to see to their well-being and care, as she has demonstrated through the entirety of these proceedings."

¶ 145    "[W]hatever [was] necessary" to the children's "well-being and care" included following Dr. O'Riordan's recommendation of cognitive behavioral therapy (with a reality emphasis), and yet, at the time of the trial before Judge Heuerman—seven years after Dr. O'Riordan made that recommendation—respondent had not completed such therapy. It included making reasonable efforts to supervise and control the children during visitations, but respondent did not make such efforts. This is not to call into question her love for her children—but love is not enough. Children need to feel physically safe (see 705 ILCS 405/1-3(4.05)(a) (West 2022)), and they need a "sense of security" (*id.* § 1-3(4.05)(d)(ii))—important features of the home that enable children to "actually feel[ ] love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel love, attachment, and a sense of being valued)" (*id.* § 1-3(4.05)(d)(i)). Uncontrolled chaos in the home, where siblings sexually prey on one another in the vicinity of blandly indifferent parents, is not conducive to safety, security, and a feeling of being loved and valued. Because respondent, over a course of several years, showed a lack of readiness and willingness to adequately supervise her children, the circuit court could have reasonably found that the children would be better off being adopted by the foster parents, who provided them with not only affection, but also structure and order. Therefore, by finding that it would be in the children's best interests to terminate respondent's parental rights, the circuit court did not make a finding that was against the manifest weight of the evidence.

¶ 146                          III. CONCLUSION

¶ 147          For the foregoing reasons, we affirm the circuit court's judgment.

¶ 148          Affirmed.